**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Dorothy Ann KNOX, (85–5952, 86–5089), Kimberly LaWanda Ware (86–5097), Altamont S. Champegnie (86–5200), Defendants–Appellants.**

Nos. 85–5952, 86–5089, 86–5097
and 86–5200.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 26, 1987.

Decided Feb. 12, 1988.

Rehearing Denied in Nos. 85–5952, 86–5089
and 86–5097 March 30, 1988.

William P. Efird (argued), Irvin M. Salky (argued), Memphis, Tenn., Jeffrey A. Miller (argued), Fort Lauderdale, Fla., for defendants-appellants.

W. Hickman Ewing, Jr., U.S. Atty., Memphis, Tenn., Timothy R. Di Scenza, Asst. U.S. Atty. (argued), for plaintiff-appellee.

Before JONES and GUY, Circuit Judges, EDWARDS, Senior Circuit Judge.

RALPH B. GUY, Jr., Circuit Judge.

A one-count indictment was returned against appellants Knox, Ware, and Champegnie charging them with aiding and abetting one another in the possession with intent to distribute a Schedule II controlled substance (cocaine), in violation of 21 U.S. C. § 841(a)(1) and 18 U.S.C. § 2. The charges arose out of defendants' arrest at the Memphis airport following the discovery of the cocaine in one of the bags in their possession. All three defendants moved to suppress the evidence and a full evidentiary hearing was conducted by the district court. Testimony was given by the arresting officer at the hearing; all three defendants elected not to testify. The district court denied defendants' suppression motions, finding that, although a seizure had occurred, it constituted a permissible investigatory detention based on a reasonable and articulable suspicion that defendants were engaged in criminal activity. The district court also found that none of the defendants had standing to challenge the search of the bag containing the cocaine, since both Ware and Knox had specifically disclaimed ownership of the bag and, therefore, none of the appellants had exhibited a legitimate expectation of privacy as to its contents.

Following this ruling, defendant Knox entered a conditional guilty plea pursuant to Fed.R.Crim.P. 11. Ware and Champegnie were tried and convicted in a subsequent jury trial. Defendants allege that the district judge erred in:

1) denying the motion to suppress;

2) failing to suppress oral statements made by defendants during questioning;

3) holding the defendants had abandoned the bag in which the cocaine was discovered and therefore lacked standing to contest its search; and

4) denying defendant Champegnie's motion for judgment of acquittal at the close of the government's case.

Finding no error, we affirm.

**I.**

On June 14, 1985, Memphis DEA Agent Richard Holmes received a telephone call from Special Agent Paul Markonni of the Atlanta, Georgia, office of the DEA. Markonni informed Agent Holmes that he had observed three individuals en route to Memphis who had acted suspiciously during a stopover at the Atlanta airport. Markonni had noticed that the three individuals, later identified as the defendants, appeared not to know each other as they exited the plane, which had just arrived in Atlanta from Miami, Florida. Markonni observed defendant Ware holding her stomach as she left the plane and rushed to an airport restroom. He also reported that defendant Champegnie had initially acted

as if he did not know Ware or Knox, although later the three were observed talking together. Markonni checked with the airline and discovered that each reservation had been made at the same time on the previous day and that all three one-way tickets had been purchased with cash. Upon dialing the Miami callback number given to the reservations agent, Markonni found that the person at that number did not know any of the persons listed on the reservations.[1]

Upon receipt of this information, Agent Holmes, a thirteen-year veteran with the DEA who had extensive experience working airport detail, became suspicious that the three individuals described by Agent Markonni were engaged in drug smuggling. He requested assistance from Memphis Metro Narcotics, including a specially trained "drug sniffing" dog, and arranged to meet with the officer at the Memphis airport. When defendants deplaned, they looked around and appeared not to know each other. Ware was carrying a blue travel bag which she subsequently handed to Knox just outside the gate area. At this point, Holmes approached the trio, identified himself as a DEA agent, and asked if they would accompany him downstairs to the airport security office. Defendants agreed but requested that they pick up their luggage first. Holmes asked Knox and Ware if he could assist them with their bags, whereupon Knox handed him the blue travel bag.

Defendants were placed in separate rooms in the vicinity of the security office, along with their luggage. Each defendant was then questioned separately; each initially denied knowing the other two. Both Champegnie and Knox stated that they had lost their airline tickets; however, when asked for her ticket, Ware pulled several tickets from her purse. Holmes asked to see them and Ware acquiesced; they were listed in the names of Kim Ware, Dorothy Knox, and A. Stanford (the name under which defendant Champegnie was traveling). As Holmes testified at the suppression hearing, although they had not specifically been told that they could leave at any time, they had been informed that they were not under arrest and that Holmes "just wanted to question them."

Once Champegnie and Knox discovered that Holmes had seen the tickets, they acknowledged that they knew each other, although Champegnie first represented that he had only met Knox and Ware on the plane and, shortly thereafter, stated that he had known them for a couple of months. Holmes then asked each defendant if they would consent to a search of their luggage. The dog from the Metro Narcotics unit was brought to the area and reacted positively for drugs as to all pieces of defendants' luggage. Defendants then signed consent forms for the search, although both Knox and Ware denied ownership or control of the blue travel bag. The search yielded approximately one kilogram of cocaine, found in the blue travel bag, as well as a book on cocaine processing entitled *The Cocaine Handbook*, found in Champegnie's briefcase. At this point, all three were placed under arrest and given *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The total length of time of defendants' detention prior to the arrest is disputed, although it appears to have been between ten and thirty minutes.

## II.

Following the evidentiary hearing on the motion to suppress, the district court entered its order denying the motions. In so ruling, the court found that sufficient objective and particularized facts existed to support the agents' suspicions and thereby rendered their investigatory detention and questioning of defendants constitutional. Further, the court held that the disclaimers of Knox and Ware as to ownership of the blue travel bag resulted in their abandonment of that item, thereby depriving them of standing to challenge the constitutionality of its search or subsequent admission

1. Upon subsequent detention for questioning by Agent Holmes, Altamont Champegnie gave his real name, although his airline ticket indicated that his name was A. Stanford.

into evidence of the contraband it contained.

Defendants raise a number of challenges to the validity of their airport detention; namely, that their initial seizure was illegal because the agent lacked a reasonable, articulable suspicion of criminal activity, that removal of defendants to the airport security office for "custodial interrogation" exceeded the limits of an investigatory field stop, and that the duration of the seizure also exceeded the permissible time limit for such a stop. Next, they argue that their inconsistent statements, first denying and then admitting they knew each other, should have been suppressed for lack of *Miranda* warnings. Finally, they contend that their abandonment, if any, of the travel bag was the product of and tainted by the illegal search and that they have standing to contest the validity of its search.

## A. The Validity of the Investigatory Stop

██ In assessing defendants' claims on this issue, we must establish, as a threshold question, whether the actions of Agent Holmes and the Memphis police constituted a "seizure" within the meaning of the Fourth Amendment. Only if they were seized are defendants vested with any right to constitutional safeguards. *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 1876, 64 L.Ed.2d 497 (1980). The district court, relying on our decision in *United States v. Jefferson*, 650 F.2d 854 (6th Cir.1981), found that defendants had been seized when approached by Holmes and asked to accompany him for questioning. We agree.

The Supreme Court has identified a "seizure" as occurring at that point in time when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at

554, 100 S.Ct. at 1877. In *Jefferson*, we held that:

[A]gent Markonni did not merely stop Jefferson to ask him a few questions; he stopped him and immediately after identifying himself as a DEA agent requested Jefferson to accompany him to the baggage claims office. In these circumstances, Jefferson could not reasonably believe that he was free to leave. This was a "seizure" within the meaning of the Fourth Amendment.

650 F.2d at 856.

However, even brief investigatory detentions rising to the level of a "seizure" are constitutionally permissible if "supported by a reasonable and articulable suspicion that the person [was] engaged in criminal activity." *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980). In determining which suspicions are "reasonable and articulable," courts are directed to consider the totality of the circumstances. *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). The police must demonstrate the existence of an "objective" as well as a "particularized" basis for their suspicions. *Id.* The first requirement is satisfied by evidence showing a common pattern of criminal operation; in this case, a showing that defendants met several characteristics of the DEA's drug courier profile.[2] The district court found that the agents' knowledge that (1) defendants were traveling from Miami, a source city, (2) their airline tickets were purchased with cash, and (3) the callback number given to the airline was inaccurate, was sufficient to satisfy the first prong of the test. Noting that satisfaction of the first prong was not enough, the district court found the requisite particularized suspicion in Agent Markonni's observations at the Atlanta airport; namely, defendant Ware exiting the plane "as if holding something under her clothing" as well

---

**2.** The 'drug courier profile' is an abstract of characteristics found to be typical of persons transporting illegal drugs." *Florida v. Royer*, 460 U.S. 491, 493 n. 2, 103 S.Ct. 1319, 1322 n. 2, 75 L.Ed.2d 229 (1983). As we noted in *United States v. Saperstein,* the variety of traits constituting these "profiles," which varies from air-

port to airport, defies any attempt at mechanical application and requires courts to assess "whether in each particular case the combination of facts present and the manner in which they are exhibited justifies a stop." 723 F.2d 1221, 1228 (6th Cir.1983).

as the fact that defendants initially appeared unfamiliar with each other but were later seen talking together.

Defendants object to the aggregation of the agents' observations to establish the requisite "reasonable and articulate" suspicions. They contend that, individually, nervousness (citing *United States v. Andrews*, 600 F.2d 563 (6th Cir.), *cert. denied sub nom. Brooks v. United States*, 444 U.S. 878, 100 S.Ct. 166, 62 L.Ed.2d 108 (1979)), travel to and from a "source city" (citing *United States v. Saperstein*, 723 F.2d 1221 (6th Cir.1983)), and deplaning at different times and appearing unfamiliar with one another (citing *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980)), are entirely consistent with innocent behavior and therefore entitled to no weight. While it is true that each of these factors, in isolation, would be insufficient as a matter of law to establish the requisite level of suspicion, this court, following the mandate of the Supreme Court, has held that articulable suspicion is to be based upon an assessment of *all* circumstances surrounding the actions of a suspected wrongdoer. *United States v. Williams*, 754 F.2d 672 (6th Cir.1985). Further, a pattern of suspicious behavior need only be recognizable by one "versed in the field of law enforcement." *Cortez*, 449 U.S. at 418, 101 S.Ct. at 695. We find the following factors relevant and sufficient to justify the defendants' seizure at the Memphis airport: (1) they were traveling from a "source city"; (2) their tickets were purchased only the day before and paid for with cash; (3) they deplaned separately and attempted to conceal the fact that they were traveling together; (4) sometime after deplaning, both in Atlanta and Memphis, defendants were observed talking together; (5) immediately upon deplaning in Atlanta, defendant Ware rushed to the restroom holding her arms across her stomach; and (6) none of the defendants were known at the callback number given when their tickets were purchased.

## B. The Challenge to the Duration of the Detention

The defendants next argue that, even if their initial detention was proper,

Agent Holmes exceeded its permissible scope and duration. The Supreme Court has directed that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. *Id.* Further, the government has the burden of demonstrating that the seizure was properly limited, although the scope of the permissible intrusion will vary with the particular facts of each case. *Id.* Defendants argue that their detention of approximately thirty minutes was inherently unreasonable. This issue has been recently addressed by the Supreme Court in *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), wherein the Court refused to establish a per se rule as to the permissible duration of an investigatory stop. The Court, in reversing the Fourth Circuit Court of Appeals, stated that "[t]he Court of Appeals' decision would effectively establish a per se rule that a twenty minute detention is too long to be justified under the *Terry* [investigatory stop] doctrine. Such a result is clearly and fundamentally at odds with our approach in this area." *Id.* at 686, 105 S.Ct. at 1575. The *Sharpe* Court's opinion on this issue bears extensive quotation:

In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.... A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation and in such cases the Court should not indulge in unrealistic second guessing.... A creative judge engaged in *post hoc* evaluation of police conduct

can almost always imagine some alternative means by which the objective of the policy might have been accomplished. But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, in itself, render the search unreasonable." ... The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.

*Id.* at 686–87, 105 S.Ct. at 1575–76 (citations omitted).

Contributing to the length of defendants' detention in this case was their initial insistence that they did not know each other, despite the fact that they were walking together at the time they were approached by Holmes and had been observed passing the blue travel bag between them. Finally, we observe that the investigation was expedited through the presence of the drug-sniffing dog at the time of defendants' detention, which allowed a sniff search to be conducted as soon as defendants had orally consented. The Supreme Court expressly endorsed such a procedure in *Royer*, stating:

> The courts are not strangers to the use of trained dogs to detect the presence of controlled substances in luggage. There is no indication here that this means was not feasible and available. If it had been used, Royer and his luggage could have been momentarily detained while this investigative procedure was carried out.... A negative result would have freed Royer in short order; *a positive result would have resulted in his justifiable arrest on probable cause.*

460 U.S. at 505–506, 103 S.Ct. at 1328–29 (emphasis added).[3]

## C. The Allegations of "Custodial Arrest" and Resulting *Miranda* Violation

Defendants contend this case is indistinguishable from *Royer*, in which the Supreme Court ruled that statements secured as a result of questioning in a separate airport office and without benefit of *Miranda* warnings must be suppressed. Admittedly, this is a difficult and unsettled area of law. We are guided in our analysis by somewhat sparse and ambiguous precedent; however, a few rules of general applicability have emerged. The Supreme Court has counselled that "[a]lthough the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (per curiam)). The test is an objective one: would a reasonable person in the defendant's position have felt that he was under arrest or was "otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 477, 86 S.Ct. at 1629. Furthermore, recent Supreme Court cases have clarified that more is required to support a finding of custody than the fact that the questioning took place in an "inherently" coercive environment.

> [A] noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes

---

**3.** We observe that Agent Holmes had arranged to have a Narcotics Unit dog present at the time of defendants' detention and that the dog-sniff carried out while their written consent was being obtained indicated a positive response to all pieces of defendants' luggage.

place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.

*Mathiason*, 429 U.S. at 495, 97 S.Ct. at 714. *Accord United States v. Wallraff*, 705 F.2d 980, 991 (8th Cir.1983) ("simply identifying the place where an interrogation occurs does not conclusively establish the presence or absence of custody").

In *Florida v. Rodriguez*, 469 U.S. 1, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984), the Supreme Court overturned the lower court's order suppressing evidence obtained as a result of an airport detention and search, stating that the court's order "reflects a misapprehension of the controlling principles of law governing airport stops" as set forth in *Royer* and *Mendenhall*. In *Rodriguez*, three suspects were approached at the Miami airport after DEA agents observed them engaging in certain behavior which they deemed suspicious. Defendants were questioned after moving to one side of the concourse and, based on inconsistencies in their answers, the agents asked for and received permission to search their luggage, whereupon a quantity of cocaine was discovered. The Court explicitly stated that "[s]uch a temporary detention for questioning in the case of an airport search is reviewed under the lesser standard enunciated in *Terry v. Ohio*, and is permissible because of the 'public interest involved in the suppression of illegal transactions in drugs or of any other serious crime.'" 469 U.S. at 5, 105 S.Ct. at 310 (quoting *Royer*, 460 U.S. at 498–99, 103 S.Ct. at 1324).

In *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the Court rejected the argument that *Miranda* warnings should not be required in *custodial* interrogations which result from stops for routine traffic violations. Although the court refused to differentiate between custodial interrogations resulting in felony charges as opposed to misdemeanor charges, it also held that roadside questioning of a motorist detained pursuant to a routine traffic stop did *not* constitute custodial interrogation. In so ruling, the Court analogized the routine traffic stop to a *Terry* stop, pointing out that in all such detentions:

> [T]he officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond.... The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion to our opinions that *Terry* stops are subject to the dictates of *Miranda*.

*Id.* at 439–40, 104 S.Ct. at 3150.

Our task in this case is to determine whether the fact that defendants were escorted voluntarily to separate rooms in the airport for questioning constituted a restraint on their freedom tantamount to a formal arrest. We hold that it did not. In a previous airport search case involving questioning in a private airport office, we concluded that appellant's voluntary presence in the office did not convert an otherwise lawful *Terry* stop into an arrest. *United States v. Smith*, 574 F.2d 882, 886 (6th Cir.1978). We also noted that "[s]ome element of official coercion" would be necessary to transform such a scenario into the equivalent of an arrest. *Id.* at 886 n. 15.

In *Royer*, the Court clearly found the following factors, in combination, persuasive:

1) questioning in a separate airport office;

2) retention of the defendant's ticket and identification;

3) retrieval of defendant's luggage by the DEA without his consent; and

4) failure to inform defendant he was free to leave.

These particular facts were determinative of the Court's conclusion that Royer was involuntarily confined under circumstances tantamount to arrest and that, the deten-

tion having exceeded the limits of an investigative stop, any "consent" to the search of his luggage was invalid.

The sole corresponding factor in the case at bar is the fact that defendants' questioning took place in the airport security office. There is no evidence in the record showing that any of defendants' tickets were retained by the agents. Further, their bags were retrieved with the agents' assistance at the defendants' *request.* While Agent Holmes did not specifically inform them that they were "free to leave," he did tell them that they were not under arrest. And we attach no significance to the fact that defendants were placed in separate rooms for questioning. When two or more individuals are suspected of illegal activity, it is obvious that questioning them together may result in each suspect backing up the story given by the others. Separate questioning often will reveal inconsistencies in suspects' answers which may lead either to probable cause to arrest or to a subsequent search revealing contraband. *See, e.g., United States v. Poitier,* 818 F.2d 679 (8th Cir.1987) (inconsistent answers given during separate consensual questioning provided reasonable suspicion for *Terry* stop); *United States v. Nembhard,* 676 F.2d 193 (6th Cir.1982) (curbside questioning, in combination with separate questioning in airport office, gave rise to probable cause). *But cf., United States v. Ceballos,* 812 F.2d 42 (2d Cir.1987).

Following the dictates of the Supreme Court, we reject, as the sole criterion for the attachment of *Miranda* rights, reliance on the concept of an "inherently coercive environment." And since the record before us is devoid of any evidence of official coercion, there is no basis for suppressing defendants' voluntary responses to the agent's questioning.

### D. The Abandonment Issue

■■■ Defendants assert that the district court improperly found that none of them possessed standing to challenge the search of the blue travel bag. Champegnie further asserts that, since there is no evidence that he had abandoned his briefcase,

the cocaine handbook found within should have been suppressed. We hold that none of the defendants had standing to challenge the admissibility of the cocaine found in the blue travel bag since none of them exhibited a legitimate expectation of privacy in the bag at the time of the search. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). A legitimate expectation of privacy incorporates two elements: first, whether the defendant "exhibited an actual (subjective) expectation of privacy," and, second, whether the defendant's subjective expectation is "one that society is prepared to recognize as reasonable." *United States v. Tolbert,* 692 F.2d 1041, 1044 (6th Cir.1982), *cert. denied,* 464 U.S. 933, 104 S.Ct. 337, 78 L.Ed.2d 306 (1983) (quoting *Katz* ). Fourth Amendment rights are personal and may not be asserted vicariously. *Rakas v. Illinois,* 439 U.S. 128, 133, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978). "[D]efendants charged with crimes of possession may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have been violated." *United States v. Salvucci,* 448 U.S. 83, 85, 100 S.Ct. 2547, 2549, 65 L.Ed.2d 619 (1980). When a defendant is aggrieved by an allegedly illegal search of a third party's property, the Fourth Amendment rights of *that* defendant have not been infringed. *Rakas,* 439 U.S. at 134, 99 S.Ct. at 425. *See also United States v. Calandrella,* 605 F.2d 236, 242 (6th Cir.), *cert. denied sub nom. Kaye v. United States,* 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979).

■■■ In *United States v. Tolbert,* this court found that when the defendant had specifically disclaimed ownership in a piece of luggage in which drugs were later discovered, the defendant had not exhibited an actual expectation of privacy in that luggage. "One who disclaims any interest in luggage thereby disclaims any concern about whether or not the contents of the luggage remain private." *Tolbert,* 692 F.2d at 1045 (quoting *United States v. Miller,* 589 F.2d 1117, 1131 (1st Cir.1978), *cert. denied,* 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979)). This court held that since the defendant had affirmatively indicated that she had no interest in the lug-

gage, she had no expectation of privacy as to the contents; therefore, her Fourth Amendment rights were not violated by the search of the luggage. *Tolbert,* 692 F.2d at 1045. Appellants Knox and Ware both specifically disclaimed ownership in the blue travel bag. The trial court, citing *Tolbert,* properly found that this disclaimer constituted an abandonment that resulted in appellants' lack of standing to challenge the search.[4] Appellant Champegnie clearly did not establish or even attempt to establish any expectation of privacy in the bag since he never had possession nor did he ever claim any interest in the bag. Champegnie's lack of standing to contest the search is firmly within the *Rakas* rule that the Fourth Amendment rights of an individual who claims to be aggrieved by the search of a third person's property have not been violated. *Rakas,* 439 U.S. at 134, 99 S.Ct. at 425. Therefore, Champegnie may not challenge the search.

■ Finally, defendant Champegnie suggests that, because the government did not contest his standing to challenge the search of the briefcase, its contents (including the copy of *The Cocaine Handbook*) should automatically have been suppressed. Although it appears that Champegnie acknowledged ownership of the briefcase, and therefore would have standing to contest its search, he alleges no facts in support of his assertion that his written consent was coerced. Having found that his detention and questioning did not exceed the bounds of a permissible investigatory stop and that Champegnie's cooperation therein was voluntary, we conclude that his written consent to the search of the brief-

case nullifies any claim he now makes regarding its validity.[5]

## E.  Sufficiency of the Evidence as to Defendant Champegnie

■ We turn now to defendant Champegnie's contention that the evidence was insufficient to sustain his conviction for aiding and abetting in the possession of a controlled substance. 18 U.S.C. § 2. This court has repeatedly stated that when a defendant challenges the sufficiency of the evidence, "[a]ny inferences that are to be drawn must be made in the light most favorable to the government." *United States v. Winston,* 687 F.2d 832, 834 (6th Cir.1982) (citing *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)). To be found guilty of the crime of aiding and abetting a criminal venture, a defendant must associate himself with the venture in a manner whereby he participates in it as something that he wishes to bring about and seeks by his acts to make succeed. *Winston,* 687 F.2d at 834. We defined the test in reviewing sufficiency of the evidence claims as deciding "whether a reasonable mind might find guilt beyond a reasonable doubt." *Id.*

■ We have no trouble concluding that reasonable jurors could find that Champegnie acted with the specific intent to facilitate the possession and/or distribution of cocaine. His possession of *The Cocaine Handbook* is entitled to be considered for whatever inferences it may raise as to Champegnie's involvement and/or interest in illegal drugs. The book contains a section entitled "health Risk" that suggests that cocaine is not addictive in the same manner as drugs such as her-

---

4. Because we find that Knox and Ware abandoned the travel bag, we do not reach their argument that any consent given by them to search their bags was vitiated by virtue of their prior illegal detention. In any event, having found that the government did not exceed the permissible bounds of investigation in this *Terry*-type stop, this argument must fail. In *Royer,* the Court stated that a defendant's voluntary consent to search given while justifiably detained on reasonable suspicion permits the introduction of any resulting evidence at a subsequent trial. 460 U.S. at 502, 103 S.Ct. at 1326. We would point out that, under *Royer,* the posi-

tive reaction of the Narcotics Unit dog alone would have established probable cause to not only search defendants' luggage, but to arrest them immediately.

5. As this court recently noted in *United States v. Williams,* a similar airport drug search case, a defendant in such circumstances may believe that his "best bet [is] to appear to consent [to the search] and then make a contrary claim at a later suppression hearing." 754 F.2d 672, 676 (6th Cir.1985). It appears to the court that Champegnie is attempting just such a strategem.

oin, as well as a section covering "Testing for Purity." The book conceivably constitutes a useful reference for those dealing in drugs. The book was found in Champegnie's briefcase, his only piece of luggage. He was also traveling under the name of A. Stanford, which constituted a deliberate misrepresentation of his identity. In addition, he initially refused to acknowledge that he knew either Knox or Ware, despite the fact that he was observed talking to them at both the Atlanta and Memphis airports and his reservation was made at the same time as theirs. When questioned further, he twice changed his story by stating that he met them on the plane and later stating that he had known them a few months.

Jurors as fact finders are entitled to make common sense conclusions regarding human behavior. *Cortez*, 449 U.S. at 418, 101 S.Ct. at 695. The jury could reasonably conclude from the foregoing circumstantial evidence that Champegnie had purposefully attempted to disassociate himself from Knox and Ware in the event of detection. Therefore, the decision of the district court with respect to all the foregoing issues is AFFIRMED.

NATHANIEL R. JONES, Circuit Judge, concurring.

I join in the judgment of Judge Guy affirming the district court's judgments of conviction as to all three defendants. However, there is more to be said since defendants also challenge, under the fifth amendment, the district court's unexplained denial of their motion to suppress statements made prior to the receipt of *Miranda* warnings. While I ultimately am compelled to conclude that no fifth amendment *Miranda* violation is established because the guiding legal principles in this area are cloudy, I write separately.

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demon-

strates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

*Id.* at 444, 86 S.Ct. at 1612 (footnote omitted). Thus, when deciding whether *Miranda* warnings were improperly withheld, it must first be determined whether the defendants were subjected to "interrogation" while "in custody."

It is clear that the brief questioning to which the defendants were subjected constituted "interrogation" under the plain language of *Miranda*, as well as the subsequent explication in *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). The Court explained in *Innis* that:

> the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Id.* at 301, 100 S.Ct. at 1689–90 (footnotes omitted). The term "incriminating response" was defined as "any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial." *Id.* at 301 n. 5, 100 S.Ct. at 1690 n. 5 (emphasis in original). Since the responses elicited from the three defendants in the instant case were inherently contradictory and, therefore, subject to introduction into evidence by the prosecution as proof of both the defendants' guilty states of mind and the officer's justification for continued detention, they were "incriminating responses."

The question whether defendants were "in custody" while they were isolated and detained in the airport security rooms is much more problematic. Referring to the original *Miranda* standard, one might be hard pressed to argue that defendants were not deprived of their freedom of ac-

tion in any significant way. Indeed, the factual similarity between the instant case and the *Miranda* cases is noteworthy—all involve police questioning of suspects while isolated in police rooms without the suspect being warned of his constitutional rights to counsel and against self-incrimination. *See* 384 U.S. at 445, 86 S.Ct. at 1612.

Despite the relative simplicity of the *Miranda* standard for determining whether a person is "in custody," the Supreme Court in a 1983 per curiam summarily reversed a decision of a California state court and essentially redefined the relevant inquiry:

> Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' *of the degree associated with a formal arrest.*

*California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam) (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (per curiam)). The italicized language could be read to engraft the fourth amendment concept of arrest onto the requirement of custody—a concept that had in some respects been treated as a fifth amendment term of art. This would be all the more unusual since the relevant provisions of the fourth and fifth amendments are based on different principles; one protects against *unreasonable* seizures while the other grants an *absolute* guarantee against compelled self-incrimination. As the Court stated in *Fisher v. United States,* 425 U.S. 391, 400, 96 S.Ct. 1569, 1576, 48 L.Ed.2d 39 (1976), "the Fifth Amendment's strictures, unlike the Fourth's, are not removed by showing reasonableness." Nonetheless, *Beheler's* amended definition of the term "in custody" has been applied without further discussion in subsequent cases. *See, e.g., Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984); *New York v. Quarles,* 467 U.S. 649, 655, 104 S.Ct. 2626, 2631, 81 L.Ed.2d 550 (1984); *Minnesota v. Murphy,* 465 U.S. 420, 430–

31, 104 S.Ct. 1136, 1143–44, 79 L.Ed.2d 409 (1984).

The real difficulty with this interpretation of the *Beheler* definition is apparent in the instant case. Investigative detentions conducted in airport security offices are very controversial from a judicial/constitutional perspective, *see, e.g., Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), but at the same time they are a highly effective law enforcement tactic. Effectiveness alone, however, does not validate that which is constitutionally invalid. The effectiveness of this tactic is due in no small part to the psychological objectives of isolated, police-dominated interrogation discussed at length in *Miranda,* 384 U.S. at 448–56, 86 S.Ct. at 1614–18. For these reasons, it is safe to say that nonconsensual, investigatory detentions conducted in airport security offices represent the outer limits of legitimate *Terry* seizures. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed. 2d 889 (1968). Still, since a valid *Terry* seizure is, by definition, not a "full seizure" —a term synonomous with "arrest"—a person properly seized on reasonable and articulable suspicion for a brief investigatory detention could never be considered "in custody" so long as the scope and duration of the *Terry* stop do not exceed the underlying justification. This would be true regardless of the fact that, ignoring momentarily the fourth amendment's considerations of the reasonableness of the seizure, the nonconsensual detention in a private police room for purposes of interrogation might closely resemble the type of "custody" the *Miranda* court had in mind.

I recognize that this theory of the impact of *Beheler* on airport *Terry* stops is arguably supported by certain dicta in the *Berkemer* opinion. In that case, the Supreme Court analogized the noncustodial nature of an ordinary traffic stop to *Terry* stops. After outlining the constitutional rationale for allowing *Terry* seizures on less than probable cause, the Court stated:

> [T]his means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the

detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released. The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda*.

*Berkemer*, 468 U.S. at 439–40, 104 S.Ct. at 3150 (footnotes omitted).[1] Nevertheless, the Court declined to announce any new bright line rule tying a determination of fifth amendment custodial interrogation to any particular fourth amendment situation. *Id.* at 441, 104 S.Ct. at 3151. Instead, it reaffirmed the case-by-case approach: "fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." *Id.* at 437, 104 S.Ct. at 3148–49. I likewise am unable to recognize such a bright line rule in this case.

Further, I reject the argument that, in view of *Beheler*, custodial interrogation can never be found in a setting that, under a pure fourth amendment analysis, is a valid investigatory detention based upon reasonable and articulable suspicion. *See United States v. Streifel*, 781 F.2d 953, 958 (1st Cir.1986) (suggesting that it is only a *general rule* that *Terry* stops do not implicate *Miranda*). If it is true that custodial interrogations and brief investigatory detentions are mutually exclusive, it is because the Supreme Court has held that "detention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the fourth amendment as necessarily to trigger the tradition-

al safeguards against illegal arrest." *Dunaway v. New York*, 442 U.S. 200, 216, 99 S.Ct. 2248, 2258, 60 L.Ed.2d 824 (1979). *See also United States v. Manbeck*, 744 F.2d 360, 379 n. 30 (4th Cir.1984), *cert. denied*, 469 U.S. 1217, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985). Accordingly, it is not impossible for investigative *Terry* stops to degenerate into custodial interrogation requiring *Miranda* warnings. But when they do, the holding of *Dunaway* requires that the seizure be justified by full probable cause as opposed to mere reasonable suspicion.[2]

Turning to the application of these principles to the case at bar, two questions must be addressed: (1) were defendants interrogated without the benefit of *Miranda* warnings while "in custody"; and, if not, (2) were their statements nonetheless involuntary? It should be observed that such an inquiry would have been assisted by specific findings of fact in the district court, but the existing record and the *sub silentio* denial of the motion to suppress provide a sufficient basis upon which to proceed. Notably, the defendants' failure to testify at the suppression hearing leaves Agent Holmes's version of the encounter uncontradicted and, perhaps not suprisingly, his testimony does not suggest that the defendants' statements were coerced in any way.

Although defendants were technically seized at the time of their questioning in the airport security rooms, the record and recent Supreme Court decisions allow but one conclusion—that they went from the public concourse to the security rooms "voluntarily." The conclusion that the defendants were seized is another way of

---

1. Of course, it must be observed that the detainee is not necessarily told that he need not respond to the officer's questions, and also need not be aware of the strict limitations on the scope and duration of the investigatory detention. If suspects were not routinely ignorant of their rights in this regard, the investigatory detention arguably would be a much less effective tool. The only thing that a reasonable person subjected to a *Terry* seizure must know is that he is not free to leave. This knowledge could certainly exacerbate the coercive atmosphere of the interrogation.

2. If it comes to pass that law enforcement officers have difficulty understanding and applying this rule, it must be recognized that the uncertainty is due to the recent, unchecked expansion of the scope of permissible investigatory detentions under the *Terry* doctrine rather than any modification of the applicability of *Miranda* safeguards to custodial interrogation. As the *Berkemer* opinion made clear, ease of application alone can not outweigh the individual's constitutional privilege against coerced self-incrimination and the need for prophylactic warnings to secure that privilege.

saying that defendants reasonably realized that they were not free to leave the premises. Nonetheless, it does not necessarily follow that the defendants reasonably perceived that they were confined to the security rooms. Thus, I do not find the uncontested facts of this case to be materially distinguishable from those of *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam) and *United States v. Harris*, 611 F.2d 170 (6th Cir. 1979). *See also Beheler*, 463 U.S. at 1124 n. 2, 103 S.Ct. at 3519 n. 2; *Sevier v. Turner*, 742 F.2d 262, 268 (6th Cir.1984) ("the mere location of an interview and the fact that an investigation has focused upon a particular person, without more, will not support a finding of custody"). Under these holdings, the defendants were not in custody at the time of the interrogation in question and *Miranda* warnings were not required. As an intermediate appellate court we are bound to follow those holdings, even if they raise serious questions.

Even if *Miranda* warnings were not required, a finding that the statements were involuntarily made or coerced in violation of the fifth amendment would require their suppression. However, viewing the totality of the circumstances as set forth in the record, I find insufficient evidence to support such a conclusion and therefore I concur in the judgment of the majority.

GEORGE CLIFTON EDWARDS, Jr., Senior Circuit Judge, dissenting.

As I see this case, the significant question is: where three airplane passengers are stopped by federal officers and led into separate airport offices wherein each is questioned about possession of cocaine found in the luggage of one of them and each separately makes statements which are subsequently used to convict him or her of illegal possession of cocaine,[1] does *Miranda v. Arizona* require reversal of said convictions since concededly no *Miranda* warnings were given until after statements had been secured?

I would answer this question in the affirmative.

This case was tried before the District Court for the Western District of Tennessee. The defendants now appeal their convictions for possession of cocaine with intent to distribute. The facts herein clearly allowed the District Court to find that defendants were in possession of cocaine with intent to distribute and were caught in such possession. That, however, does not end this argument.

On June 14, 1985, Memphis Drug Enforcement Administration (DEA) Agent Richard Holmes received a telephone call from DEA Agent Paul Markonni, who was assigned to the airport detail in Atlanta, Georgia. Agent Markonni advised Agent Holmes that he had observed one male and two females (later identified as the three defendants) at the Atlanta airport when they exited a plane arriving from Miami, Florida. Agent Markonni reported that he noticed one of the females (Ware) holding one of her arms across her abdomen, as if she were holding something, and rush to an airport restroom. When Ware returned from the restroom, she was no longer holding her stomach. Markonni also reported that the defendants had initially acted as though they didn't know each other, but later had talked with one another. Markonni checked with the airline and learned that each reservation had been made at the same time the previous day and that the tickets had been purchased with cash. He also checked a "call-back" telephone number in Miami that had been given to the airline by the person who had made the reservations, and discovered that the person who answered the telephone at that number did not know any of the defendants.

Agent Holmes and officers from Memphis Metro Narcotics met the defendants' flight at the Memphis Airport. The officers stationed themselves outside the gate area and observed the defendants as they

---

**1.** Appellant Dorothy Ann Knox submitted a Conditional Plea of Guilty which, however, "specifically reserves ... all appeal rights as to all issues raised in defendant's Motion to Suppress...." The practical effect of this Plea is to place her before this court in the same position as the other two defendants and I treat all three jointly in this opinion.

left the plane. All the officers were in plain clothes and no guns were drawn; a uniformed airport security guard, however, may have been positioned somewhere near the gate area. Agent Holmes noted that the defendants entered the gate area separately, and "looked around and acted like they didn't know each other." Agent Holmes also noticed Ware carrying a blue travel bag which she subsequently handed to Knox just outside the gate area.

Agent Holmes then approached the defendants, identified himself as a Special Agent of the DEA, and told them that he would like to speak with them for a few minutes. Holmes asked the defendants to accompany him and the other officers (four or five in number) to the Airport Security Office. The defendants agreed, but requested that they pick up their luggage first. Agent Holmes and the local officers then assisted the defendants in retrieving their luggage from the baggage claim area. Agent Holmes asked both female defendants, either before or after retrieving the checked luggage, if he could "assist" them in carrying their bags. He was given the blue travel bag, according to the government by Knox, and according to the defendants, by "Knox or someone."

All of the above facts represent both lawful and effective police work.

After they arrived in the Airport Security Office, the defendants were each placed in separate rooms. Agent Holmes went from room to room, questioning each defendant separately. Agent Holmes did not, during this questioning, give any of the defendants *Miranda* warnings.

All three defendants initially denied that they knew each other. When Agent Holmes asked to see defendant Champegnie's identification and airline ticket, Champegnie identified himself as Altamont Champegnie, but stated that he had lost his boarding pass and airline ticket. Knox also told Agent Holmes that she did not have her ticket. While questioning Ware, Agent Holmes saw Ware reach into her purse to retrieve her identification, and in doing so, she pulled out a group of airline tickets and boarding passes. Agent Holmes asked

Ware if he could see the tickets. The tickets and boarding passes were listed in the names of Kim Ware, Dorothy Knox, and A. Stanford, the latter of which was later discovered to be the name under which Champegnie was traveling. Once Champegnie knew that Agent Holmes had seen the tickets, he acknowledged that he did know Ware and Knox, although he first represented that he had only met them on the plane, and shortly thereafter, he stated that he had known them for a couple of months. While Agent Holmes was questioning the defendants, each defendants' luggage was located with them in their respective rooms, except for the blue travel bag, which was placed just outside the door of Ware's room.

Agent Holmes unzipped, but did not search, the blue travel bag prior to obtaining each defendant's consent to search. Holmes testified that he unzipped the bag out of habit, since it is standard procedure to check for a weapon when interviewing an individual.

In addition, Holmes had a trained police dog go over the defendants' luggage in their presence. The dog responded positively for cocaine as to both the luggage and the blue travel bag. Subsequently, each defendant consented to a search of his or her individual luggage, but denied ownership or control of the blue travel bag. Ware claimed that the bag belonged to Knox and Knox claimed that the bag belonged to Ware. Approximately one kilogram of cocaine, valued at $35,000 was discovered in the blue travel bag. The blue travel bag also contained female and unisex clothes (clothes which can be worn by either a man or a woman). Neither drugs nor contraband were found in any of the luggage, but a book on cocaine processing titled *The Cocaine Handbook* was found in Champegnie's briefcase. The book covered such topics as "Testing for Purity, Health Risk, Safeguards, Improving Quality, Inside the Cocaine Trade, and Cocaine and the Law."

After the search and discovery of the cocaine, the defendants were given *Miranda* warning and placed under formal

arrest. Agent Holmes also testified that he had advised defendants of their rights prior to their signing the consent forms. The defendants had been detained and/or questioned from ten to thirty minutes prior to their arrest (the parties' estimates vary and the District Court did not attempt to resolve this disputed question of fact). During the detention period the defendants were neither told that they were free to go nor that they were under arrest. The District Court found that "[a] seizure of the person did occur when Agent Holmes stopped the defendants and requested that they come with him for questioning."

It appears to me that there is no question but that there was evidence of violation of the drug laws by all three of the defendants. What is at issue, however, is whether or not the procedures which were employed in isolating the defendants and questioning them before giving them *Miranda* warnings so violated their constitutional rights as to require our concluding that the critical evidence seized should have been and must now be suppressed. Four cases are especially cited to us in this regard; *United States v. Tolbert,* 692 F.2d 1041 (6th Cir.1982), *cert. denied,* 464 U.S. 933, 104 S.Ct. 337, 78 L.Ed.2d 306 (1983); *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and *Reid v. Georgia,* 448 U.S. 438, 440, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (1980).

There is, however, a later opinion of the U.S. Supreme Court which I regard as controlling in our instant case. See *Berkemer v. McCarty,* 468 U.S. 420, 434, 104 S.Ct. 3138, 3147, 82 L.Ed.2d 317 (1984). In *Berkemer,* the Supreme Court unanimously affirmed this Court's decision in *McCarty v. Herdman,* 716 F.2d 361 (1983). The single headnote in this Court's treatment of the *McCarty* case stated "Miranda warnings must be given to all individuals prior to custodial interrogation, whether the offense investigated be a felony or a misdemeanor traffic offense."

As I read the record of our instant case it appears clear that each defendant was isolated in a separate room and questioned from between ten to thirty minutes by law enforcement officers before *Miranda* warnings were given. It appears that evidence derived from this unwarned questioning after seizure and in isolation was admitted at trial against defendants. Under these circumstances, the convictions should have been and must now be vacated.

I am aware, of course, that the Supreme Court in *Berkemer* also held that *Miranda* warnings need not be given during an ordinary traffic stop. The Court further noted "the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda.*" 468 U.S. at 440, 104 S.Ct. at 3150. However, whether the detention in the present case is considered a *Terry* stop, or a full seizure, it is clearly more akin to the station house interrogation which prompted *Miranda* than the ordinary traffic stop involved in *Berkemer.* Indeed, the airport security office functions as a station house at the airport, and should be treated accordingly. See *Miranda,* 384 U.S. at 445, 86 S.Ct. at 1612 (consolidated *Miranda* cases all involved questioning in a room in which defendant was cut off from the outside world); *Berkemer,* 468 U.S. at 437, 104 S.Ct. at 3148 (*Miranda* must be strictly enforced in situations in which the concerns that produced that decision are implicated).