900 F.2d 260
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Sabrina L. JOHNSON, Defendant-Appellant.
 No. 89-3386.
 United States Court of Appeals, Sixth Circuit.
 April 23, 1990.
 
 Before RALPH B. GUY, Jr. and BOGGS, Circuit Judges, and AVERN COHN, District Judge.*
 RALPH B. GUY, Jr., Circuit Judge.
 
 
 1
 After losing a suppression motion, defendant, Sabrina Johnson, entered a conditional guilty plea to a one-count indictment charging her with possession of cocaine with intent to distribute. 21 U.S.C. Sec. 841(a)(1). On appeal, she argues that the district court erred in denying her suppression motion and in upholding the legality of the airport search which uncovered the cocaine in her possession.
 
 
 2
 Upon a review of the record of the suppression hearing and giving the deference that we must to the credibility findings of the district judge, we affirm.
 
 I.
 
 3
 On November 5, 1988, members of a Cleveland-area narcotics task force received informant information that a black female would be travelling from Cleveland, Ohio, to Miami, Florida, and would shortly return on a direct flight from Miami carrying drugs. Surveillance was instituted, and a female fitting the description given was seen boarding a Miami flight. The individual was described as in her twenties, short, and wearing normal dress. Since it was not known exactly when the return would occur, airport surveillance was continued on direct incoming Eastern Airlines flights from Miami.
 
 
 4
 On November 8, 1988, a three-person surveillance unit observed the defendant, a black female of short stature in her twenties, deplane from a direct flight from Miami. The defendant was the only black female aboard this flight. The agents present were not the agents who saw the female depart on November 5, so they only had a general description and essentially were looking for a black female. Upon observing the defendant, the agents immediately noticed two things: first, she was extremely nervous and kept looking around at the agents; and, second, she walked in a very strange manner. As one agent described it: "It was like she was wearing a diaper and it was loaded...."
 
 
 5
 Johnson was followed to the women's toilet, which she entered. One of the agents, a female, subsequently entered the toilet and observed the defendant standing at the sink and closing up her carry-on luggage as if she had just put something in it. When Johnson exited the toilet, the agents continued to follow her and observed that she went to the departure area rather than downstairs to the baggage area and also observed that she was no longer walking abnormally.
 
 
 6
 As Johnson was preparing to leave the terminal, one of the agents approached her and identified the three officers as Cleveland police narcotics officers conducting an investigation. The officer then asked: "Would you mind if we asked you a few questions?" Johnson responded: "No, fine." (App. 22). Johnson was asked her name and, after hesitating, she said, "Linda." When asked her last name, she hesitated again and said, "Thomas." When asked for identification, she had none. Upon request and without objection, Johnson produced her airline ticket, which was a one-way ticket purchased that day and paid for in cash. There were no baggage tickets.
 
 
 7
 The defendant was then asked if she was in Cleveland to visit someone and she said, "No." When asked where she was going to stay, she said she didn't know. Since this questioning was taking place directly in front of the exit doors of the terminal, Johnson, when asked, agreed to go to a more private area to continue the discussion. The three agents and Johnson then walked downstairs to the airport police office, a relatively small room with two desks, some airport surveillance TV monitors, and a glass door allowing persons to see in or out.
 
 
 8
 Once in the room, Johnson was asked if she could afford lodging, and she responded by pulling out $45.00 in cash from her purse. She had no credit cards of any kind. At this point, one of the agents asked if they could look into her carry-on bag. After Johnson refused permission, the agents told her at this point they had enough information to obtain a search warrant. Johnson was again asked to consent to a search, and she agreed.[1]
 
 
 9
 Before beginning the search, the agents had Johnson sign a consent to search form, which she voluntarily agreed to do. In connection with filling out the form, Johnson was again asked if her name was Linda Thomas. At this point "she kind of broke down and she said, 'My name is Sabrina Johnson,' and added, 'I have drugs in the bag.' " (App. 29).
 
 
 10
 Johnson then went on to explain that the drugs in the bag were originally transported by her in her underpants, but this made walking so difficult that she had to go into the toilet and transfer the drugs to her carry-on bag. She also admitted that she had additional drugs taped to her body and in her armpit. Johnson was arrested and subsequently indicted.
 
 
 11
 In connection with the suppression hearing, the government learned that Johnson had an extensive minor criminal record with 25 previous arrests. Johnson, who testified at the suppression hearing, also indicated that she spotted the three surveillance officers as soon as she deplaned, and concluded that they were police, which explained her nervousness.
 
 II.
 
 12
 Although there is no shortage of airport search cases, we find that we can resolve this case within the confines of the legal analysis provided in the Supreme Court's recent decision in United States v. Sokolow, 109 S.Ct. 1581 (1989), and our earlier airport search case, United States v. Knox, 839 F.2d 285 (6th Cir.1988), cert. denied, 109 S.Ct. 1742 (1989). Although both Sokolow and this case might be described as drug courier profile cases, the Court in Sokolow eschewed making any kind of profile analysis. Similarly, we do not feel this appeal directly implicates the drug courier profile. In Sokolow, the Court stated:
 
 
 13
 A court sitting to determine the existence of reasonable suspicion must require the agent to articulate the factors leading to that conclusion, but the fact that these factors may be set forth in a "profile" does not somehow detract from their evidentiary significance as seen by a trained agent.
 
 
 14
 109 S.Ct. at 1587.
 
 
 15
 Here, the agents were not "trolling" in the airport for suspects generally exhibiting certain profile characteristics. Instead, they were watching only Eastern Airlines direct flights from Miami to Cleveland, specifically looking for a young, short, black female who was expected to arrive in Cleveland within the time frame in which the defendant arrived. This is not to suggest that the agents could begin stopping all black females but, rather, that it provided a specific focus for their surveillance. Because their attention was called to the defendant in particular, they observed her nervousness and her unusual gait caused by the drugs she was carrying in her undergarments. When they further observed that, after a stop in the ladies' restroom, her walk was normal and that she did not go to the baggage claim area or toward the airport exit, the agents had reasonable suspicion supported by articulable facts that criminal activity was "afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968). In short, the agents had enough to justify an investigative stop, given the totality of the circumstances.
 
 
 16
 The Fourth Amendment requires "some minimal level of objective justification" for making the stop. INS v. Delgado, 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984). That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means "a fair probability that contraband or evidence of a crime will be found," Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983), and the level of suspicion required for a Terry stop is obviously less demanding than that for probable cause. See United States v. Montoya de Hernandez, 473 U.S. 531, 541, 544, 105 S.Ct. 3304, 3312, 87 L.Ed.2d 381 (1985).
 
 
 17
 Sokolow, 109 S.Ct. at 1585.
 
 
 18
 Given these conditions, we need spend little time on the issue of whether defendant felt she was free to leave once she was stopped by the agents. In Knox, we addressed this issue:
 
 
 19
 However, even brief investigatory detentions rising to the level of a "seizure" are constitutionally permissible if "supported by a reasonable and articulable suspicion that the person [was] engaged in criminal activity." Reid v. Georgia, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980)....
 
 
 20
 839 F.2d at 289.
 
 
 21
 Similarly, Knox resolves the issue of defendant voluntarily accompanying the agents to the police airport office.[2]
 
 
 22
 Our task in this case is to determine whether the fact that defendants were escorted voluntarily to separate rooms in the airport for questioning constituted a restraint on their freedom tantamount to a formal arrest. We hold that it did not. In a previous airport search case involving questioning in a private airport office, we concluded that appellant's voluntary presence in the office did not convert an otherwise lawful Terry stop into an arrest. United States v. Smith, 574 F.2d 882, 886 (6th Cir.1978). We also noted that "[s]ome element of official coercion" would be necessary to transform such a scenario into the equivalent of an arrest. Id. at 886 n. 15.
 
 
 23
 Knox, 839 F.2d at 292.
 
 
 24
 This takes us to the events that occurred in the airport police office and the question of whether the consent to search was, in fact, consensual. We agree with the district court that it was. Although defendant argues that she only consented because she was told that it would take eight hours to get a search warrant, the agents deny making any such comment. The district judge credited the testimony of the agents on this issue, and we defer to his judgment exercised from the superior vantage point of the trial courtroom and his actual observation of the witnesses. In this regard, we find the officers' statement to Johnson that they had probable cause to obtain a search warrant to be a reasonable assessment of the circumstances at that point in time and not an instance of overreaching.
 
 
 25
 We recognize that in any police detention, no matter how legitimate, there is an element of coercion growing out of the nervousness generated, even in the pure of heart, by such a confrontation. However, where the stop and questioning are legitimate, the fact that guilty knowledge on the part of the detainee pushes in the direction of cooperation cannot be equated with coercion. Here, Johnson knew she had lied to the officers about her name and that her failure to articulate a purpose or destination in Cleveland made her look bad. She also knew that she had over two pounds of cocaine taped to various parts of her body and in her carry-on bag. It is not surprising that under these circumstances she felt that enlightened self-interest dictated cooperation. Johnson, with her 25 previous arrests, was no stranger to police procedures and reasonably knew that the game was over. We find no police coercion that would vitiate consent under these circumstances.
 
 
 26
 AFFIRMED.
 
 
 
 *
 Honorable Avern Cohn, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 As would be expected, there are some variations between the defendant's version of what occurred and that of the agents. The above facts are as found by the district judge, and we do not disagree with his credibility determination
 
 
 [2]
 The district court concluded that the defendant voluntarily agreed to continue the questioning in a less congested and public area, and we agree