UNITED STATES of America, Plaintiff,

v.

Sherri Lynn WHITEHOUSE, Defendant.

No. 94–CR–80728.

United States District Court,
E.D. Michigan,
Southern Division.

April 11, 1996.

Graham Teale, Asst. U.S. Attorney, Detroit, MI, for U.S.

Leroy Soles, Detroit, MI, for defendant.

*OPINION AND ORDER REGARDING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS*

ROSEN, District Judge.

## I. INTRODUCTION

Defendant Sherri Lynn Whitehouse ("Defendant") was arrested and subsequently in-

dicted on one count of possession with intent to distribute methamphetamine, a Schedule III controlled substance, after she was stopped by Drug Enforcement Agency ("DEA") task force agents at Detroit Metropolitan Airport and found to be carrying the drug in a package taped around her waist under her clothing. Presently before the Court is Defendant's Motion to Suppress the drug evidence seized by the agents and statements she subsequently made at a DEA field office.

The Court conducted a two-day evidentiary hearing on Defendant's motion, during which the Court heard the testimony of the three drug task force agents involved in this matter: Wayne County Sheriff Jadie Settles, Michigan State Trooper Harold Reid, and Detroit Metropolitan Airport police officer Catherine Knott. Following the hearing, the Court granted Defendant leave to file a supplemental brief on the suppression motion, and the Government subsequently responded to this supplemental brief.

Having reviewed and considered the Defendant's and the Government's respective pre- and post-hearing briefs, and having further reviewed the testimony and other evidence presented at the evidentiary hearing on this matter, the Court is now prepared to rule on Defendant's motion. This Opinion and Order sets forth that ruling.

## II. PERTINENT FACTS

On July 18, 1994, Wayne County Sheriff Jadie Settles, a member of the DEA Detroit Metropolitan Airport Drug Task Force, received a telephone call from Chicago-based DEA Special Agent Scott Masumoto concerning possible drug trafficking by two persons travelling to Detroit, Albert Paille and Sherri Lynn Whitehouse.

According to Officer Settles, Agent Masumoto advised her that Paille and Whitehouse were travelling from Los Angeles to Detroit on one-way tickets which had been paid for in cash. En route to Detroit, the couple had stopped in Chicago to change planes. Masumoto informed Settles that the Chicago DEA agents had been told that Paille and Whitehouse had acted suspiciously on the LA-to-Chicago leg of their flight, switching seats after boarding the aircraft. Agent Masumoto further informed Settles that Paille was listed in NADDIS (the Narcotics and Dangerous Drugs Information System) as a suspected drug trafficker, and that he had previously been involved in the distribution of chemically-formulated drugs, including PCP and LSD.

Agent Masumoto told Officer Settles that, based on this information, he and fellow Chicago task force agents Frank Henry and James Hennelly went to the gate at O'Hare Airport where Paille and Whitehouse were scheduled to arrive. Paille and Whitehouse exited the plane together and proceeded down the airport concourse. Paille was carrying two black gym bags. While they walked through the concourse, both Paille and Whitehouse kept looking from side to side and Paille kept looking over his shoulder, in a nervous fashion.

According to Settles, Masumoto related that Paille and Whitehouse had voluntarily agreed to talk to the agents and had voluntarily provided their tickets and ID. Paille produced a Michigan Department of Corrections Inmate ID card, and Whitehouse produced a California driver's license. They were thanked for their cooperation and told that they were in no trouble. The couple was further told that the agents were members of the Airport Drug Interdiction Group assigned to investigate drug trafficking from source cities like Los Angeles. They were then asked about their bags. Paille volunteered that the agent was welcome to search the bags.

Settles testified that Masumoto indicated that at this point, Whitehouse said she was suffering from diarrhea and needed to use the bathroom. Settles could not remember whether Masumoto specifically had stated that Whitehouse had said she was pregnant, or whether Masumoto merely stated that she looked like she was pregnant. Whitehouse was directed toward the restroom and, as she left, was asked by Paille, "Are you feeling OK, dear?" Whitehouse did not respond, but simply left for the restroom. Paille was asked if Whitehouse was his wife. Paille responded that, while she was only his girlfriend, she might as well be his wife.

Paille was then asked if the agents could search the two gym bags, and he agreed. Agent Masumoto then opened the bags. Settles testified that Masumoto related that during the search, Paille appeared nervous when small zip-lock baggies were found among the contents of the gym bags. When asked what the baggies were for, Paille's hands were shaking. He responded that the baggies were used for storing small knife blades.

Paille also consented to a pat-down search of his person. During the pat-down his hands continued to shake. Whitehouse subsequently returned and told the agents that she felt much better. She was asked if she had any items on her and she said that she did not, and that she just wanted to sit down close to the restrooms. Masumoto told Officer Settles that Whitehouse was not searched because they did not have a female agent on duty, and because Whitehouse had said she was sick. Whitehouse then headed for the departure gate for the flight to Detroit. Paille subsequently followed Whitehouse to the departure gate.

Masumoto then contacted the Detroit Metro Task Force at Detroit Metropolitan Airport, relaying to Officer Settles the information the Chicago agents had concerning Paille and Whitehouse. This information included a description of the couple and the Chicago agents' observations of, and contact with, the couple.

Officer Settles relayed the information to the other officers in the Detroit Metro office, and then went with the other officers to the airport terminal to set up surveillance of the arrival of flight from Chicago.

Settles testified that Paille exited the plane first, and that Whitehouse deplaned several moments later. Although Whitehouse and Paille had acted as if they were a "couple" in Chicago and had appeared to be travelling together, the two acted as if they did not know each other upon their arrival in Detroit. Paille walked two-thirds of the way down the concourse, and then returned to the gate area, looked around for several minutes (giving the appearance that he was expecting someone), and proceeded down the escalator to the baggage claim area. Whitehouse walked directly to the baggage claim area immediately after exiting the aircraft, without making eye contact with Paille. Neither Paille nor Whitehouse had checked any luggage. In the baggage area, the two were observed looking around frequently as though they were each looking for someone, but they still avoided contact with one another. Paille and Whitehouse then left the terminal through separate exits, each carrying one of the black gym bags.

Agents Cathy Knott and Jadie Settles kept surveillance on Paille and made a "police-citizen contact" with him. Settles testified that they approached Paille, identified themselves, and asked if Paille would mind answering some questions. During this contact, Paille stated that he was travelling alone.

Meanwhile, Agents Anthony Norman and Harold Reid kept surveillance of Whitehouse as she left the baggage area. Agent Reid testified that Whitehouse appeared nervous. He said that, upon exiting the terminal, she nervously paced back and forth, then crossed the street in an apparent search for a car. As Reid approached Whitehouse outside the terminal, he identified himself as a police officer and showed her his ID. He did not display any weapon and did not raise his voice. He asked if they could talk with her for a minute. Reid testified that Whitehouse did not appear alarmed, and that she agreed to talk to them.

Reid asked Whitehouse if she was in Detroit on business or pleasure; she responded that she had formerly lived in the Detroit area, and that she came to Detroit because she needed to get away for awhile. Reid asked to see her airline ticket, and Whitehouse complied. Reid testified that the ticket indicated that Whitehouse had purchased it with cash.

Agent Reid explained that he and Norman were narcotics officers, and that their job was to interdict the flow of narcotics through the airport. He asked if she would cooperate with them and allow them to search her bag and her person. Whitehouse said she would cooperate, and added that someone had already talked to her in Chicago. Agent Reid searched her bag and jacket and found noth-

4

ing. He testified that he next told White-house that he wanted to call a female partner in order to search her person, to which Whitehouse responded, "Fine." Reid then called for Agent Cathy Knott to join him to conduct the search of Whitehouse's person.

When Agent Knott arrived, Reid said that Whitehouse raised her arms. Reid advised her, "You can put your hands down; you're not under arrest," and Whitehouse respond-ed, "Yes, I know." Agent Knott testified that, upon arriving, she specifically asked Whitehouse, "Do you consent for me to search you?" Knott testified that White-house responded, "Yes." Knott asked if Whitehouse wanted to go to a more private location to be searched, suggesting a nearby ladies' room, and Whitehouse agreed. Reid told Whitehouse that once Knott completed her search, she was free to leave.

Agent Knott and Whitehouse then pro-ceeded to the restroom. Agent Knott testi-fied that they did not talk while walking to the restroom. Once in the ladies' room, Agent Knott asked Whitehouse, "Are you pregnant?" and then asked her to lift her shirt so that she could see whether she was pregnant. Whitehouse lifted her shirt, re-vealing a package taped around her waist and further revealing that she was not preg-nant. Indicating the bundle taped to her body, Knott asked what it was. Whitehouse said she didn't know. At this point, Knott placed Whitehouse under arrest, and hand-cuffed her.

Meanwhile, Agent Reid waited outside of the restroom. When Officer Knott and Ms. Whitehouse came out of the restroom, Reid observed that Whitehouse was in handcuffs. He testified that Officer Knott said, "She's body carrying." Reid then issued Miranda warnings to Whitehouse. She agreed to co-operate with the agents, and was subsequent-ly transported to a DEA field office.

According to Defendant's brief, White-house made incriminating statements at the field office. It was also at the field office that the agents seized the package taped around her waist. Later lab analysis of the substance in the package revealed that it was methamphetamine.

On cross-examination of the agents, de-fense counsel challenged the officers' testi-mony, pointing out that some of the com-ments related at the hearing were not contained in the officers' written report. In particular, defense counsel noted that the officers' written report of their encoun-ter with Whitehouse did not indicate that Officer Knott had independently asked Whitehouse whether she consented to be-ing searched after Agent Reid had previ-ously sought her consent. In addition, the report reflects neither Reid's assurance that Whitehouse was not under arrest when she raised her arms for a search of her person, nor Knott's question whether Whitehouse would prefer to go to the rest-room for a more private search.

The Court, however, finds none of these omissions material; nor does the Court find that such omissions render the officers' testi-mony incredible. Quite the contrary, the Court finds the agents' testimony to be whol-ly credible. Accordingly, no contradictory evidence having been presented, the Court adopts the agents' testimony as reflected in this Opinion and Order as its findings of fact.

## III. DISCUSSION

Defendant Whitehouse moves to suppress the evidence of the package found taped to her waist and to suppress the statements she made at the DEA field office. Defendant contends that the agents lacked either a rea-sonable articulable suspicion or probable cause to justify her detention/arrest. She further argues that, even if her detention is not deemed a "seizure," her consent was not freely and voluntarily given in light of the circumstances of her questioning by the De-troit agents.

### A. THE VALIDITY OF THE INVESTI-GATORY STOP OF DEFENDANT

The threshold question for determining the validity of the "investigatory stop" and ques-tioning of Defendant Whitehouse outside the airport terminal is whether the actions of the drug task force agents constituted a "sei-zure" within the meaning of the Fourth Amendment. *United States v. Knox,* 839 F.2d 285, 289 (6th Cir.1988), *cert. denied,* 490 U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179

(1989). Only upon her seizure was Defendant vested with any right to constitutional safeguards. *United States v. Mendenhall,* 446 U.S. 544, 553, 100 S.Ct. 1870, 1876, 64 L.Ed.2d 497 (1980); *United States v. Knox, supra.* The Supreme Court has identified a "seizure" as occurring at that point in time when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall, supra,* 446 U.S. at 554, 100 S.Ct. at 1876.

■ In *United States v. Jefferson,* 650 F.2d 854 (6th Cir.1981), the Sixth Circuit held that the defendants in that case had been seized when approached by an airport drug enforcement agent and asked to accompany the agent for questioning. Similarly, in *United States v. Knox, supra,* the Court found a seizure of the defendants from the moment that a drug enforcement agent first confronted them, because the agent had immediately asked them to accompany him to the airport security office for questioning. In contrast, a person is not detained for Fourth Amendment purposes when a law enforcement officer merely shows his badge or credentials and asks if the person would be willing to answer a few questions, nor does a Fourth Amendment detention occur if an individual is requested to produce airline tickets and identification to law enforcement officials. *United States v. Collis,* 766 F.2d 219 (6th Cir.1985); *United States v. Lucci,* 758 F.2d 153 (6th Cir.1985); *United States v. Tolbert,* 692 F.2d 1041 (6th Cir.1982).

■ Thus, the relevant test for a Fourth Amendment "seizure" is whether a point has been reached at which a reasonable person, under the "totality of the circumstances," would believe that he would not have been free to leave **if he had not responded to the initial questioning.** *United States v. Mendenhall, supra.* The *Mendenhall* Court explained that a person has been "seized" within the meaning of the Fourth Amendment when,

> in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the

> person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indication that compliance with the officer's request might be compelled.

446 U.S. at 554–55, 100 S.Ct. at 1877 (citations omitted).

■ In this case, under the totality of the circumstances surrounding Defendant's pre-arrest contact with the Detroit agents, the Court finds that Defendant could not reasonably have believed that she would not have been free to leave if she had chosen not to respond to the agents' initial questioning. There is no evidence of coercion, a "threatening presence" of a number of officers, a display of weapons, or even raised voices. There is simply insufficient evidence of record which might have indicated to Defendant that compliance with the officers' request to search her bag, her coat, and her person was compelled.

■ However, even if the Court were to conclude that the agents' approach of Defendant and the subsequent search of her person in the ladies' room constituted a "seizure," Defendant is still not entitled to suppression of evidence in this case. Even brief investigatory detentions rising to the level of a "seizure" are constitutionally permissible if supported by a "reasonable suspicion" that the person detained was engaged in wrongdoing. *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *see also United States v. Knox, supra.* The *Sokolow* Court explained that "reasonable suspicion" entails only "some minimal level of objective justification" for making an investigative stop—that is, "something more than an inchoate and unparticularized suspicion or 'hunch', but less than the level of suspicion required for probable cause." 490 U.S. at 7, 109 S.Ct. at 1585.

In this case, Defendant argues that the only "objective justification" that the Detroit

agents had for stopping her was the suspicions that the Chicago agents had formed and passed along, based upon their observations of her at O'Hare and the information they had received concerning the possible drug trafficking activities of her travelling companion, Albert Paille. Defendant contends that such "successive" stops are not permissible unless there are "fresh" facts that independently establish a reasonable suspicion of criminal activity.

In support of her invalid successive stop argument, Defendant relies on *United States v. Peters*, 10 F.3d 1517 (10th Cir.1993), *United States v. Garcia*, 23 F.3d 1331 (8th Cir. 1994), and *United States v. Morin*, 665 F.2d 765 (5th Cir.1982). Apart from the fact that none of these cases represents the law of this jurisdiction,[1] the Court finds that all of these cases are factually distinguishable from the instant matter.

In *Peters*, the Tenth Circuit reversed a defendant's conviction for unlawful possession of identification documents and false representation of citizenship, based upon the court's determination that information learned by one officer who had previously stopped the defendant and searched his vehicle could not be used to establish a federal agent's "reasonable suspicion" as justification for his own stop of the defendant later that day. In that case, a Flagstaff, Arizona police officer, Officer Martin, was on morning patrol duty when he noticed a rented Ryder truck driving ahead of him. The truck was weaving from lane to lane on the four-lane road. When it crossed over the center line, the police officer promptly pulled the vehicle over.

Officer Martin obtained the driver's and the passenger's identifications. The driver had a Florida driver's license in the name of Durojaiye Peters. The passenger, Godwin Ayinde, had a Georgia license. The driver told Officer Martin that they were brothers and students, and that they were moving from California to Dallas. When Martin asked where they were originally from, the two men responded that they were from Nigeria. Martin opined that both men acted "extremely nervous" and were "shaky, swea-

ty and kept looking at each other side to side quite often." 10 F.3d at 1519.

Officer Martin took their licenses back to his patrol car and, upon running a computer check, discovered no irregularities. Martin then decided to investigate the possibility that the two men were nervous because they were hauling illegal drugs. Over the radio, he requested a drug-sniffing canine from the highway patrol, but none was available. He then returned to Peters' car and gave the driver a written warning to drive in one lane. He next asked if he could search the truck. Peters agreed and promptly signed a consent form. When Martin opened the back of the truck, he discovered items typical of a van being used to move across country—clothing, boxes, appliances, and other apartment furnishings. He searched the truck's contents, found nothing, and, not having a drug-sniffing canine to search further, told the men they could go on their way.

Immediately after the encounter, Martin reported to his superior that he "didn't feel good" about the stop, and that he continued to suspect drug activity because of the suspects' nervousness and his failure to obtain a drug sniffing canine. Martin's superior reported the incident to the Albuquerque office of the DEA, which referred the matter to Agent Ochoa at the border patrol station in Albuquerque. The DEA provided Agent Ochoa with a description of the truck and its occupants. Ochoa then called Officer Martin. Martin told Ochoa everything he had learned about the individuals when he stopped them, told him about his search of the truck, and advised Ochoa of his continuing suspicion of drug activity due to Peters' and Ayinde's nervousness.

After talking to Martin, Ochoa drove out to the east-west highway in order to intercept the suspects as they passed through Albuquerque. When he spotted their truck, he requested backup and a drug-sniffing canine. He then pulled the truck over, asked for identification, and sought consent to search their wallets. The search of the wallets disclosed counterfeit social security and immigration cards. A subsequent thorough

---

1. It does not appear that the Sixth Circuit has    addressed the issue of "successive" *Terry* stops.

search of the vehicle revealed false identification documents hidden in a suitcase. No drugs were discovered.

The two men were charged with possession of false identification documents and false representation of citizenship. After the district court denied their motion to suppress the evidence found by Agent Ochoa, they pleaded guilty and were sentenced. The Tenth Circuit reversed their convictions, finding that, although the first *Terry* stop of the defendants may have been justified by a reasonable suspicion of illegal activities, the second *Terry* stop could be justified by nothing more than the suspicions of the first officer.

Next, in *United States v. Garcia, supra,* the Eighth Circuit reversed a district court's decision denying the defendants' motions to suppress evidence obtained during a second *Terry* stop, finding that most of the facts upon which the Government had relied to support the second stop had been obtained during an earlier aborted traffic stop and search. Similarly, in *United States v. Morin, supra,* the Fifth Circuit held that the arrest of the defendant following a second *Terry* stop was illegal because he was allowed to walk away from the initial stop, and because the second stop was made without benefit of any new information.

In contrast to the above cases, and contrary to the assertions of Defendant, in this case the Detroit officers did not rely *solely* on information provided by the Chicago authorities. Rather, the Detroit agents themselves observed Defendant's and Paille's behavior—*i.e.*, acting as if they did not know each other, exiting through the baggage claim area although they had checked no baggage, and leaving through separate doors. This *additional* information, when coupled with the information provided by the Chicago agents that the two had been travelling together and had represented that they were "almost married", *and* together with the information concerning Paille's drug trafficking history, clearly provided the Detroit officers ample justification for their suspicion that Paille and Defendant were engaged in drug trafficking. In short, this simply is not a case where the "second" stop is based on nothing more than the same suspicious activities observed by officers during the first stop. Quite the contrary, apart from the Detroit agents' observation that Mr. Paille appeared nervous, those agents also observed that the behavior of the "couple" (Defendant and Paille together) was entirely different from their behavior as described by the Chicago officers.

■ Moreover, in this modern era of transcontinental drug trafficking, it would be wholly unreasonable for this Court to hold that officers in one city cannot consider and act upon reliable information provided by officers in another city, nor even compare this information with their own observations when making a decision whether to stop suspected drug traffickers. Where law enforcement officials in another city have previously interviewed a suspect, it would be absurd to prohibit any subsequent reliance on the information gleaned in such an interview, particularly when one considers that officers are permitted to rely upon information from informants in making search and seizure determinations, even if the informants are themselves suspected of criminal activities. *Illinois v. Gates,* 462 U.S. 213, 233–35, 103 S.Ct. 2317, 2329–30, 76 L.Ed.2d 527 (1983). Indeed, as *Gates* itself shows, officers may even rely upon information provided by anonymous sources in making stops, so long as the reliability of the information has somehow been established. *Gates,* 462 U.S. at 243–46, 103 S.Ct. at 2335–36. Thus, to preclude the Detroit agents in this case from considering and acting upon information received from Chicago-based agents who had actually spoken with Defendant and her travelling companion would unnecessarily encumber collaborative law enforcement operations without any conceivable constitutional justification.

For these reasons, the Court finds that the Detroit drug task force agents had a reasonable articulable suspicion that Defendant was engaged in wrongdoing on July 18, 1994. Accordingly, the Detroit agents were justified in detaining Defendant.

**8**

## B. *VOLUNTARINESS OF DEFENDANT'S CONSENT*

 The final issue presented in Defendant's motion to suppress is whether she voluntarily "consented" to be searched in the restroom. The Government bears the burden of proving consent by "clear and positive" evidence. *United States v. Kelly,* 913 F.2d 261, 265 (6th Cir.1990). Consent must be voluntarily given, and not the result of duress or coercion, express or implied. *Schneckloth v. Bustamonte,* 412 U.S. 218, 248, 93 S.Ct. 2041, 2058, 36 L.Ed.2d 854 (1973); *see also United States v. Williams,* 754 F.2d 672, 674–75 (6th Cir.1985). Voluntariness is a question to be determined from all the circumstances. *Schneckloth, supra; United States v. McCaleb,* 552 F.2d 717, 720 (6th Cir.1977).

 The testimony of the officers in this case establishes that Defendant voluntarily consented to Officer Knott's search. There is no evidence of coercion, nor any evidence that she was threatened. Rather, the unrefuted evidence is that she voluntarily consented *twice*—first to Agent Reid, and then again to Officer Knott, *while on a public street,* not in the confines of a police station. There is simply no evidence of record to establish that her consent resulted from duress or coercion. In short, there is nothing in this record to indicate that Ms. Whitehouse's "will had been overborne ... and [her] capacity for self-determination critically impaired." *Schneckloth, supra,* 412 U.S. at 225, 93 S.Ct. at 2046.

For these reasons, the Court finds that Officer Knott properly searched Defendant based on her voluntarily given consent.

## C. *DEFENDANT'S POST-ARREST STATEMENTS*

The Court having determined that the Detroit agents properly stopped Defendant in the airport, and having further determined that the search of Defendant's person was performed pursuant to her voluntarily given consent, there is no "poisonous tree" to taint the statements made by Defendant after the drugs were found on her. She was advised of her *Miranda* rights immediately after the

drugs were found and before she made any statements. Therefore, just as the Court finds no basis for suppression of the drugs found on Defendant, the Court also finds no basis for suppression of the statements Defendant made subsequent to her arrest.

## IV. *CONCLUSION*

For all of the reasons stated in this Opinion and Order,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant Sherri Lynn Whitehouse's Motion to Suppress Evidence and Statements be, and hereby is, DENIED.