**UNITED STATES of America, Plaintiff-Appellee,**

v.

**James Charles WOOD, Defendant-Appellant.**

**No. 85–1079.**

United States Court of Appeals, Sixth Circuit.

Argued Nov. 6, 1985.

Decided Jan. 6, 1986.

Robert E. Bourne (argued), Midland, Mich., for defendant-appellant.

Michael J. Hluchaniuk (argued), Asst. U.S. Atty., Bay City, Mich., for plaintiff-appellee.

Before MARTIN, JONES and WELLFORD, Circuit Judges.

PER CURIAM.

Defendant James Charles Wood appeals from his conviction under 18 U.S.C. § 2113 of two counts of robbery of an FDIC-insured bank. Wood was found guilty of twice robbing the Twining, Michigan, branch of the State Bank of Standish (Bank), on February 22, 1984, and again on June 18, 1984. The defendant claims on appeal that the evidence offered by the government to establish the FDIC-insured status of the Bank was insufficient to establish that element of the crime charged, and that he was denied due process by the presentation of witnesses to rebut defendant's alibi without advance notice as required by Fed.R.Crim.P. 12.1. We affirm the judgment of the district court.

## I.

One of the elements of the offense defined by 18 U.S.C. § 2113, with which defendant was charged, is that the deposits of the financial institution robbed must have been insured by the FDIC at the time of the robbery. 18 U.S.C. § 2113(f). As its first witness, the government called Robert Garry, an assistant vice president with the State Bank of Standish. Garry had been employed in that position for 14 years and served as a commercial loan officer and the bank security officer. Garry testified as follows:

Q. Do you know if the bank is insured by the Federal Deposit Insurance Corporation?

A. Yes, it is.

Q. How long has the bank been insured through that entity?

A. The oldest certificate we have on file is 1969, and I'm sure we were insured before that point.

**THE COURT:** Correct me though, the bank is not insured, but it's the deposits that are insured?

**A.** Yes, we pay a premium on our total outstanding deposits.

**THE COURT:** But it's the deposits that are insured, the individual depositors who are insured and not the bank.

**A.** That's true. But we pay a premium for that protection.

**Q.** (Mr. Hluchaniuk continuing): You've paid that premium since at least 1969?

**A.** Yes.

J/A 24–25. No further evidence was presented as to this element of the crime. The defendant argues that this evidence is insufficient to establish the FDIC-insured status of the Bank at the times the Bank was robbed, and that the district court thus erred in denying the defendant's motion for judgment of acquittal.

■ In determining the sufficiency of evidence on appeal, this court must determine whether viewing the evidence and all reasonable inferences in the light most favorable to the government, a reasonable trier of fact could find evidence establishing each element of the crime beyond a reasonable doubt. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

■ In *United States v. Rowan*, 518 F.2d 685, 692–93 (6th Cir.), *cert. denied*, 423 U.S. 949, 96 S.Ct. 368, 46 L.Ed.2d 284 (1975), this court held that a 1969 certificate of insurance and a statement by the branch manager that the branch was FDIC-insured at the time of trial in 1974 was sufficient evidence to support a reasonable inference that the bank was insured at the time of the robbery in 1974. Here, the Bank officer's testimony that the Bank had on file a 1969 certificate of insurance and that the FDIC insurance premiums had been paid since 1969 similarly supports a reasonable inference of FDIC-insured status in February and June 1984.

We note also that this testimony went uncontradicted at trial and that the Bank officer was not cross-examined on this point. At the same time, we recognize that it is the government's responsibility to prove every necessary element of the offenses charged.

Although we are troubled by the failure of the government to have introduced stronger proof of the FDIC-insured status of the bank at the time of the robberies [1] we find that the testimony offered was sufficient, even if it was not as strong and conclusive as it could have been, to permit a rational trier of fact to find FDIC-insured status established beyond a reasonable doubt.

## II. .

Defendant next contends that the government violated its duty under Fed.R. Crim.P. 12.1 to disclose the identities of two alibi rebuttal witnesses, Charlotte Ziembo and Lawrence Vorwerck, and that the district court thus erred in admitting their testimony.

The evidence at trial indicated that at about 10:00 a.m. on February 22, 1984, a lone male entered the Twining Branch of the State Bank of Standish. He pulled out a handgun and pointed it at the two tellers who were there at the time. He produced a pillow case, into which the tellers put approximately $29,000, and left the bank a few minutes later. The money was in various denominations including about $8,000 in twenty dollar bills and about $100 in two dollar bills.

Earlier in the morning the defendant had called his former wife in the Pontiac, Michigan, area and asked her to come and get him at a place just north of Twining. She met the defendant at approximately 10:30 that morning and drove him back to the Pontiac area. Later that day the defendant purchased a truck and paid for it en-

---

**1.** The government could have obtained and introduced a copy of a current FDIC certificate of insurance issued to the Bank or evidence of payment of premiums. *See United States v. Riley,* 435 F.2d 725, 726 (6th Cir.1970) (certifi- cate of insurance held sufficient). *But see United States v. Platenburg,* 657 F.2d 797 (5th Cir. 1981) (holding introduction of 1972 certificate of insurance insufficient alone to establish FDIC-insured status in 1979).

tirely with twenty dollar bills. Defendant also spent a substantial amount of money on other items within the next several days. Defendant had been evicted from the place he was living earlier in February since the rent had not been paid.

At about noon on June 18, 1984, a lone male entered the same bank with a handgun. He also produced a pillow case into which three tellers (two of whom were present at the first robbery) put about $5,000.00. He left a few minutes later. During the first robbery the bank surveillance camera was not operating. During the second robbery, however, it was functioning and pictures of the robber were taken.

The two tellers who were present during both robberies testified that the defendant was the robber on both occasions and the third teller identified the defendant as the robber in June. A customer who had entered the bank during the course of the second robbery also identified the defendant as the robber.

A search warrant was executed on defendant's residence in July of 1984. Seized in the search was a bag containing, among other things, a wig and a pair of gloves. Also seized was a briefcase containing two handguns, a piece of paper with the defendant's fingerprint on it, and a list containing the location of several banks in semi-rural areas of Michigan as well as their proximity to police stations and the number of employees. One of the tellers stated that it appeared that the robber in June wore a wig. The two handguns found in the briefcase were similar to the ones used in the robberies.

On October 18, 1984, the government filed a "Demand For Notice of Alibi Defense." On November 1, 1984, defendant filed a "Notice of Alibi Defense" with respect to the June robbery. On November 2, 1984, defendant filed a second such notice for the February robbery indicating that "Deborah Hofmann of Bay City" would be an alibi witness. On November 14, 1984, a supplemental notice was filed giving Hofmann's specific address and listing three other people as possible alibi witnesses for the February robbery.

The government completed its proof at trial on November 28, 1984. The next day defendant began presenting his proof, completing it December 3. Deborah Hofmann testified on November 29 and 30, 1984.[2] Hofmann testified that on February 20, 1984, she saw someone she thought was her stepdaughter (whom she had not seen since the summer of 1983) in a mall in Bay City and later she decided to go "north" and look for her. She said her car wouldn't start, and she met someone named "Billy" who helped her fix her car and decided to ride along with her. Later that evening the two of them stopped at a bar in Whittemore, Michigan, for a drink and ultimately met the defendant. Hofmann and Billy dropped the defendant off at a trailer later that evening and returned to Bay City. Hofmann described the route to the trailer and the trailer itself in some detail. In response to the defendant's request for help with his car, Hofmann and Billy agreed to return the following day to the trailer. Early the next morning Hofmann and Billy returned to where they had left the defendant and then took him to where his car had broken down. They worked on the car until about 9:30 a.m. and then dropped the defendant off at the trailer at about 10:00 a.m., which was the approximate time of the robbery 9.5 miles away. Hofmann had even made a diary, recording the events to which she testified. During the government's cross-examination of Hofmann on November 29 and 30, 1984, the government's attorney carefully wrote on a board in the courtroom the specifics as to which Hofmann testified.

The defendant testified on his own behalf consistently with Hofmann's version of his whereabouts at the time of the first robbery. He denied on cross-examination that he had ever attempted to get anyone to lie on his behalf.

---

2. Counsel for the government has informed the court that Hofmann has subsequently pled guilty to making false declarations in connection with her testimony in this case.

In response to the proofs of the defendant, the government offered 10 rebuttal witnesses. Finally, on December 4, 1984, the government called witnesses Vorwerck and Ziembo, to rebut the defendant's alibi as to the February charge. Vorwerck, with the Sheriff's Department, established that both Hofmann and Ziembo had visited defendant while he was in jail awaiting trial. Another rebuttal witness authenticated phone records showing numerous phone calls between Hofmann's residence and a phone near defendant's cell.

Charlotte Ziembo, a rebuttal witness, testified that she had met defendant on October 24, 1984, at her friend's request.[3] She said defendant had asked her to testify at his trial that she had been with him the night before the robbery and on the morning of the robbery. She further stated that these facts weren't true and that the defendant had promised her certain things in exchange for giving this testimony.

Ziembo also said that she suggested that the defendant write down the testimony that she was to give on his behalf. She eventually received such a letter, which was introduced into evidence at trial. The letter outlined a highly detailed alibi that closely corresponded to Hofmann's testimony and to the defendant's. Prior to the testimony of Vorwerck and Ziembo, the government had not disclosed the identity of either witness, the nature of their proposed testimony, or the existence or contents of the letter.

Because defense counsel had not seen the letter, the court took an early lunch recess to permit defense counsel an opportunity to review the letter and to interview Ziembo. Prior to this recess, the government's attorney indicated to the court that he would request additional jury instructions dealing with fabrication of evidence

and exculpatory statements later shown to be false.

After the noon recess, defense counsel made a motion for a mistrial based upon the government's failure to disclose the letter under Fed.R.Crim.P. 16(a)(1)(C) as being material to the preparation of the defense, further citing Rule 16(c) to indicate the government's continuing duty to disclose. Defense counsel alleged that the government was aware of the existence of the letter at the time Hofmann was testifying and that allegation was not denied by the government's attorney. Defense counsel did not object under Rule 12.1 to the testimony of Ziembo or Vorwerck as undisclosed rebuttal alibi witness and did not ask for a continuance. The district court denied defendant's motion for a mistrial and observed:

> I'm sure that this is somewhat of a bomb, but it's a bomb of your client's—if it's true, it's a bomb of your client's own creation.
>
> If it's not true, it's the most complex frame I've ever heard of.
>
> Your Motion for mistrial is denied.

Although the defendant's failure to object to the testimony of Ziembo and Vorwerck prevented the development of a record on this point, it is clear to us that counsel for the government was aware of the substance of their testimony on Thursday and Friday, November 29 and 30, 1984, during the cross-examination of Hofmann.[4] Thus, defendant argues that the government's failure to notify defendant of the planned testimony of Ziembo and Vorwerck during the 4 to 5 days between the cross-examination of Hofmann and the testimony of Ziembo and Vorwerck on December 4, 1984, violates Fed.R.Crim.P. 12.1(b) and requires reversal.[5]

---

**3.** This friend was a cellmate of the defendant's.

**4.** At oral argument, counsel for the government (who also served as trial counsel) admitted that he had learned of Ziembo's testimony during Hofmann's direct testimony.

**5.** In the absence of a timely and proper objection, the type of claim presented here is general-

ly not reviewable unless it constitutes "plain error" under Fed.R.Crim.P. 52(b). The government argues on appeal that defendant's failure to object to the testimony of Vorwerck and Ziembo on Rule 12.1 grounds should bar review as there was no plain error in the admission of this testimony.

Under Fed.R.Crim.P. 12.1, once the government has requested notice of a defendant's alibi defense, both the defendant and the government are obligated to disclose the names and addresses of its witnesses on the alibi issue. The government's obligation is set out in Rule 12.1(b):

**(b) Disclosure of Information and Witness.** Within ten days thereafter, but in no event less than ten days before trial, unless the court otherwise directs, the attorney for the government shall serve upon the defendant or his attorney a written notice stating *the names and addresses of the witnesses upon whom the government intends to rely to establish the defendant's presence at the scene* of the alleged offense and *any other witnesses to be relied on to rebut testimony of any of the defendant's alibi witnesses.*

Fed.R.Crim.P. 12.1(b) (emphasis added). Both parties are also under a continuing duty "promptly" to disclose any such information discovered prior to or during trial. Fed.R.Crim.P. 12.1(c). The sanction for failure to comply is provided in Rule 12(d):

**(d) Failure to Comply.** Upon the failure of either party to comply with the requirements of this rule, the court *may exclude the testimony of any undisclosed witness* offered by such party as *to the defendant's absence from or presence at the scene of the alleged offense.* This rule shall not limit the right of the defendant to testify in his own behalf.

Fed.R.Crim.P. 12(d) (emphasis added). Finally, under Rule 12(e), "[f]or good cause shown, the court may grant an exception to any of the requirements of subdivisions (a) through (d) of this rule." Fed.R.Crim.P. 12(e).

The government argues that "mere impeachment testimony" does not trigger the notice requirements of Rule 12.1(b). Its position is that

the type of alibi rebuttal witness contemplated by Subsection (b) must be one that testifies regarding the defendant's absence from or presence at the scene of the [crime].

The Fifth Circuit, in *United States v. Myers*, 550 F.2d 1036, 1041–42 (5th Cir. 1977), *cert. denied*, 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978), has rejected this argument in the context of alibi rebuttal witnesses offered by the government. After examining the legislative history of the Rule,[6] the court noted that "[t]his statement indicates that Congress intended Section (b) to require government disclosure, not just of witnesses placing the defendant at the scene of the offense, but also of witnesses like those whose identities the government failed to reveal in this case." *Id.* at 1042. Finding the Rule applicable, the court then employed a five-factor analysis to determine whether the district court abused its discretion in failing to exclude the testimony.

In *United States v. White*, 583 F.2d 899 (6th Cir.1978), this court employed the analysis of *Myers* to affirm the exclusion of an undisclosed defense alibi witness. Quoting *Myers*, this court noted that in determining how to exercise its discretionary power to exclude the testimony of undisclosed witnesses under Rule 12.1(d),

a district court should consider (1) the amount of prejudice that resulted from the failure to disclose, (2) the reason for

Because of the explicit nature of the government's obligation under Fed.R.Crim.P. 12.1, and because the Supreme Court has ruled that reciprocal disclosure by the government may at least to some extent be constitutionally required in a notice-of-alibi rule, *Wardius v. Oregon*, 412 U.S. 470, 475–76, 93 S.Ct. 2208, 2212–13, 37 L.Ed.2d 82 (1973), we discuss the merits of defendant's claim.

**6.** The court quoted the following from the legislative history:

The Committee rule not only requires the prosecution to provide the names of witnesses who place the defendant at the scene of the crime, but it also requires the prosecution to turn over the names of those witnesses who will be called in rebuttal to the defendant alibi witnesses. This is information that the defendant is not otherwise entitled to discover.

H.R.Rep. N. 94–247, 94th Cong., 1st Sess. (1975), reprinted in [1975] U.S.Code Cong. & Adm. News, pp. 647, 681.

nondisclosure, (3) the extent to which the harm caused by nondisclosure was mitigated by subsequent events, (4) the weight of the properly admitted evidence supporting the defendant's guilt,. and (5) other relevant factors arising out of the case.

583 F.2d at 902 (quoting *Myers,* 550 F.2d at 1043).

 A number of circuit courts have held that a district court does not abuse its discretion by failing to exclude an undisclosed government alibi rebuttal witness where the defendant had prior knowledge of the undisclosed witness's testimony. *McClendon v. United States,* 587 F.2d 384, 388 (8th Cir.1978), *cert. denied,* 440 U.S. 983, 99 S.Ct. 1793, 60 L.Ed.2d 244 (1979); *United States v. Floyd,* 555 F.2d 45 (2d Cir.), *cert. denied,* 434 U.S. 851, 98 S.Ct. 163, 54 L.Ed.2d 120 (1977); *United States v. Ortega-Chavez,* 682 F.2d 1086, 1089 (5th Cir.1982); *United States v. Vela,* 673 F.2d 86, 89 (5th Cir.1982); *United States v. Portillo,* 633 F.2d 1313, 1324 (9th Cir.1980), *cert. denied,* 450 U.S. 1043, 101 S.Ct. 1764, 68 L.Ed.2d 241 (1981). Although none of these cases deal directly with the situation presented by this case, they convince us that the defendant's actual knowledge of an alibi rebuttal witness's identity and testimony is an important factor to be weighed by the district court in deciding whether to exclude the witness's testimony under Rule 12.1(d).

 Here, the testimony of Vorwerck and Ziembo, taken together with the testimony of Hofmann and the defendant Wood, clearly would indicate that Wood knew the substance of Ziembo's purported testimony prior to trial, and the role she was to play as his planned alibi witness. Considering this fact, the fact that the substance of the testimony of the alibi rebuttal witnesses here involved the alleged solicitation of witnesses for the commission of perjury, and the great weight of the other evidence presented against the defendant, we hold that the district court did not abuse its discretion in permitting Ziembo and Vorwerck to testify. The unusual circumstance here of solicitation of false alibi testimony by the defendant is a strong relevant factor in our decision that the district court did not err in refusing to grant a mistrial under the circumstances.[7]

Defendant here was the author of his own undoing, and the government did not learn about the deliberate false testimony of Hofmann until she was already in the process of submitting what was, in effect, an attempt to pervert the administration of justice. Accordingly, we find no basis to disturb the judgment of the district court.

The verdict of the district court is therefore AFFIRMED.

---

7. We have no reason to believe that Wood's counsel knew of these circumstances and no implication of wrongdoing on his part should be inferred.