**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Toryano Lement BABB, Defendant–
Appellant.**

No. 01–1476.

United States Court of Appeals,
Sixth Circuit.

July 23, 2003.

Before KEITH, SUHRHEINRICH and CLAY, Circuit Judges.

PER CURIAM.

Defendant–Appellant Toryano Lement Babb appeals from the district court's decision denying his motion to suppress evidence during his bank robbery trial, that he claims was obtained in violation of his Fourth Amendment rights. He contends that Michigan State Troopers had no reasonable suspicion to stop his car, and, in the alternative, he claims that troopers violated his Fourth Amendment rights when they subsequently removed him from the car and searched his vehicle. Moreover, Babb claims that even if the evidence was not unconstitutionally obtained, the evidence against him is insufficient to support his conviction. We find Babb's challenges without merit and AFFIRM the decision of the district court.

## I.

On October 27, 1999, the Michigan National Bank in Wyoming, Michigan was robbed by a masked gunman wearing a black jacket with a white oval label, black gloves, and a backward baseball cap. The robber was a black man wearing a clear mask with painted-on lips and eyebrows. The gunman demanded that three bank employees open the vault and help him fill a white garbage bag with money. Afterward, he closed the employees in the vault and exited through a side door.

On March 9, 2000, the United Bank in Grand Rapids, Michigan was also robbed by an armed black man wearing a clear mask with painted-on lips and eyebrows. He wore a similar-looking black pullover jacket and black gloves. Again, the robber ordered the two employees in the bank to open the vault and fill a white garbage bag with money. However, the employees could not open the vault because it was on a fifteen minute timer, so the robber took all the money from both employees' drawers and "buses,"[1] sent the employees into a small lunchroom, and fled. From the lunchroom, one of the employees, Keri Kopanen, testified that she saw a "teal green" car pull away from the bank.

---

1. A "bus" is a bank teller's personal vault containing money with which she replenishes her drawer.

On April 20, 2000, the Michigan National Bank in Grand Rapids was likewise robbed. The robber, again, was a black man with a clear mask wearing a dark jacket. He forced the bank employees to empty their cash drawers and to open the vault. Again, he ordered the employees to help him fill a white garbage bag. Afterward, he forced the employees to get on the ground and he fled the bank. As he fled, Jodi Hickman, a financial sales representative with the bank, observed the robber from a window. She noted that the robber entered a "silverish" car. A customer, Ron Karasiewicz, was pulling into the bank parking lot as the robber was fleeing. He identified the robber's vehicle as a late model Oldsmobile Alero, and agreed that it was silver. The robber entered the passenger side door of the car and was driven away by an unidentified driver.

One hour after the third bank robbery, Federal Bureau of Investigations ("FBI") Special Agent William Fleming received the information from the witnesses and issued a "Be on the Lookout" ("BOLO") for a late model Oldsmobile Alero with a blue and white Michigan license plate. He listed the occupants as a black male, in his twenties or thirties, with dark clothing. He listed the possible driver as a black female, also in her twenties or thirties.[2]

Fleming testified that he included the female driver in the BOLO because he had investigated a series of bank robberies with similar *modus operandi* in Ohio and Michigan, some of which involved a female meeting the above description as a getaway driver.

Michigan State Troopers Emmitt McGowan and Scott Reinacher received the BOLO bulletin as they were separately working in and around the Brighton, Michigan area. McGowan set up a post along Interstate-96 and eventually spotted a newer Oldsmobile Alero driven by a black male riding alone, and heading east on I-96 toward Detroit. McGowan entered traffic behind the Alero. He radioed Reinacher, his partner, who was sitting along I-96 further east, and informed him that he planned to stop the Alero as soon as he passed the location where Reinacher was sitting. As McGowan and the Alero passed Reinacher, Reinacher pulled into traffic behind them. Each officer activated his emergency lights. The officers each testified that the Alero did not initially stop, so the officers activated their sirens. The Alero pulled off to the right.

McGowan approached the Alero's passenger side window. The driver rolled down the window. McGowan asked the driver for his information. The driver produced a Michigan driver's license identify-

---

2. Specifically, the BOLO read as follows: "ATTENTION DISPATCHERS" PLEASE BROADCAST THIS MESSAGE ESPECIALLY THOSE ALONG I-96 AND I-94 BETWEEN GRAND RAPIDS AND DETROIT BOL FOR THE FOLLOWING VEHICLE AND SUSPECTS WANTED FOR THE ARMED ROBBERY OF A MICHIGAN NATIONAL BANK IN GRAND RAPIDS, MI AT APPROX. 11:30 AM, THIS DATE WHERE 59 TO 80,000 WAS TAKEN FROM THE VAULT. THE SUSPECTS ARE BELIEVED TO BE ENROUTE [sic] BACK TO THE DETROIT AREA FROM GRAND RAPIDS AND MAY BE DRIVING THE BELOW LISTED VEHICLE. THEY ARE CONSID-ERED ARMED AND DANGEROUS AND ARE BELIEVED TO HAVE COMMITTED SEVERAL SIMILAR ROBBERIES IN THE GREATER DETROIT AREA. THE WEAPON USED ARE [sic] AUTOMATIC PISTOLS
SUSPECT VEHICLE: LATE MODEL SILVER OR GREY OLDSMOBILE ALERO WITH A BLUE/WHITE MICHIGAN PLATE
SUSPECT 1: B/F DRIVER, MID 20-30S
SUSPECT 2: B/M PASSENGER, MID 20-30S, 6-1, 220LBS, CLEAR PLASTIC FACE MASK, DARK CLOTHING, COMMITTED THE ROBBERY AND LAYS ON THE BACK SEAT DURING THE GET-AWAY

ing himself as Malcolm Law, as well as a rental agreement for the vehicle under the name Toryano Babb. McGowan noticed that the driver matched the physical description of the robber from the BOLO, and also noticed black clothing in the backseat of the car.

McGowan asked the driver where he was coming from, and the driver responded that he had just visited some family in Lansing, Michigan, an hour west of Brighton. However, the driver was unable to provide the location in Lansing where his family lived. McGowan asked the driver to exit the vehicle, and escorted him to Reinacher. McGowan proceeded to search the interior of the Alero, and found a compact disc case containing a white powder substance that McGowan believed might have been cocaine. Upon discovering this substance, McGowan signaled to Reinacher to arrest the driver. Reinacher handcuffed the driver and took him into custody.

After the driver was taken into custody, McGowan obtained the key from the Alero's ignition and searched the car's trunk. In the trunk, McGowan found two duffle bags. One contained approximately $22,000 in cash, and the other contained a clear mask, dark gloves, and a pistol.

At the Michigan State Police Post in Brighton. FBI Special Agent Gregory Stejskal commenced an interview with the Alero's driver. The driver was read his *Miranda* rights. Stejskal informed the driver that he did not believe that his name was Malcolm Law, but rather believed him to be Toryano Babb. After Stejskal informed the driver that fingerprint analysis would determine his true identity, the driver admitted he was Toryano Babb. Babb admitted involvement in the third bank robbery but denied involvement in the other two.

Later that day, a search warrant was executed at Babb's residence in Taylor, Michigan. The police found a portable safe in a closet, containing approximately $2000 in American currency and $500 in Canadian currency, as well as a California driver's license in the name of Malcolm Law. In a dresser drawer, police also recovered packs of currency. Some were bundled in straps marked "Michigan National Bank," and others were bundled in straps labeled with the initials "KK." Lastly, officers found an Avis car rental receipt in Babb's name for a green Chevrolet Cavalier which was rented on March 8, 2000 and returned on March 9, 2000 after being driven 404 miles.

On April 21, 2000, Babb was charged with the April 20 robbery of the Michigan National Bank in Grand Rapids, in violation of 18 U.S.C. §§ 2113(a) and (d). On June 27, 2000, a superseding indictment was issued charging Babb also with the October 27, 1999 robbery of the Michigan National Bank in Wyoming, and the March 9, 2000 robbery of the United Bank in Grand Rapids. Babb was also charged with three counts of brandishing a firearm during the commission of a crime under § 924(c)(1)(A)(iii).

On July 3, 2000, Babb filed a motion to suppress all evidence obtained as a result of the traffic stop. Babb claimed that the BOLO was not sufficient to provide officers with reasonable suspicion to stop Babb's vehicle. Babb claimed the BOLO was vague because the "police were not certain that the alleged get-a-way car was still being used and the descriptions of the occupants were sketchy at best;" and also, "Aleros, similar looking cars, and blue/white Michigan plates are quite common." Memorandum in Support of Motion to Suppress, at 18–19. Moreover, Babb asserted that too much time had passed between the third robbery and the time of the stop for any passing Alero to have given officers a reasonable suspicion that

the driver was involved in the robbery. Two hours and forty-eight minutes had passed, yet Grand Rapids and Brighton are only one-hundred miles apart. Lastly, Babb argued that because the stop of his Alero was not supported by reasonable suspicion, all evidence later discovered at his residence and during his interview should have been likewise suppressed as "fruits of the poisonous tree" under *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

Alternatively, Babb argued that there was no probable cause to support the warrant to search his home in Taylor because "it was clear that [Babb] had not made it to the residence between the time that the bank was robbed and his arrest." Also, Babb asserted that the supporting affidavit did "not establish a sufficient linkage between the prior robberies and the Taylor address to warrant a search...." Memorandum in Support of Motion to Suppress, at 20.

On October 20, 2000, the district court denied Babb's motion to suppress. On November 6, 2000, Babb was tried by jury, and on November 13, the jury found Babb guilty of each of the three bank robberies, and each of the three weapons counts. On March 27, 2001, the district court held a sentencing hearing, and Babb was sentenced to 762 months (63 years, 6 months). Babb filed a notice of appeal on April 4, 2001, and this matter is timely before this Court under Fed. R.App. P. 4(b).

## II.

We review the denial of a motion to suppress under a mixed standard of review. That is, we examine the district court's factual conclusions for clear error, and its legal conclusions *de novo. United States v. Galloway,* 316 F.3d 624, 628 (6th Cir.2003).

On appeal, Babb claims that McGowan and Reinacher lacked reasonable suspicion to stop his car on I–96, and further claims that, even if reasonable suspicion did exist the officers did not have reason to order Babb from his vehicle, and then search it. Babb has abandoned his probable cause and "fruits of the poisonous tree" claims from below.

Under the Fourth Amendment, police officers may briefly stop an individual if they have "reasonable suspicion" that that individual has committed a crime. In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court first stated that "the police should be allowed to 'stop' a person and detain him briefly for questioning upon suspicion that he may be connected with criminal activity." *Id.* at 10, 88 S.Ct. 1868. "[I]n justifying the intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. 1868. The Court later extended this principle to the stop of a car. *Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). In *Berkemer,* the Court stated that a policeman may stop a car if his "'observations lead him reasonably to suspect' that a particular person has committed, is committing, or is about to commit a crime...." *Id.* (citations omitted).

The Government relies on the BOLO as reasonable suspicion for the stop and raises the case of *United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). In *Hensley,* the Supreme Court found reasonable suspicion where a traffic stop was based on a wanted bulletin from another jurisdiction. *Id.* at 232, 105 S.Ct. 675. Babb, however, claims that he and his vehicle did not match the description given in the BOLO, and in any event, the BOLO was too vague to support a finding of reasonable suspicion.

■ First, Babb claims that the officers had no reasonable suspicion to stop his Alero because the BOLO specifically stated that there were two passengers, whereas he was alone in his Alero. We addressed a similar claim in *United States v. Hurst*, 228 F.3d 751 (6th Cir.2000). In that case, the home of Rodney Smith was burglarized. Upon discovering the crime, Smith reported to police that he had seen a "dark-colored [Ford] Thunderbird in the driveway of his house shortly before he discovered the burglary had occurred." *Id.* at 755. Moreover, he claimed the Thunderbird had two occupants. Police subsequently stopped a navy blue Mercury Cougar with three occupants. The defendant, Scottie Ray Hurst, filed a motion to suppress, claiming, as Babb does here, that the officers lacked reasonable suspicion to stop his vehicle because the model of car and the number of passengers did not match the description given the police. The district court denied the motion to suppress, and we affirmed, finding that, even though the car did not match the description exactly, the policeman who stopped the car had "knowledge of specific and articulable facts, which, taken together, with reasonable inferences, certainly give rise to reasonable suspicion of criminal activity." *Id.* at 757. We found that the reasonable suspicion standard requires that "an officer making a *Terry* stop must have more than a hunch," but that reasonable suspicion required "considerably less than proof of wrongdoing by a preponderance of the evidence." *Id.* (citing *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)); *Houston v. Clark County Sheriff*, 174 F.3d 809, 813 (6th Cir.1999).

We also found that "[t]he presence of three persons in the car, rather than two, is a discrepancy that might reasonably be explained in any number of ways and does not defeat the assessment that [the stopping officer] had reasonable grounds to investigate further," and that the stop was not unconstitutional based on the totality of the circumstances. *Hurst*, 228 F.3d at 757. In *Hurst*, the totality of the circumstances showed that a Cougar and a Thunderbird are almost identical models, and the car was the proper distance from Smith's house based on the time of the robbery. Likewise, here, we find that the discrepancy between the number of passengers in the BOLO and the number of passengers in Babb's Alero does not defeat the assessment of reasonable suspicion. As in *Hurst*, there are a number of reasons why there may have been less passengers than stated. For instance, Babb could have dropped off the second person. The totality of the circumstances shows that the car matched in make, model, and color; that Babb matched the physical description of the robber; and the car was traveling the route expected in the BOLO.

■ Babb also claims that the BOLO was too vague to support an inference of reasonable suspicion. He claims that the model and color of his car are not distinctive. First, he contends that there are many silver or grey Oldsmobile Aleros on the road and therefore "the vehicle, traveling in Michigan, was hardly distinctive." Brief for Appellant, at 8. Second, the blue and white plates on the Alero are the common Michigan plates, and therefore were not out of the ordinary. Lastly, Babb claims that the fact that he is black is not a distinctive characteristic because "in the Detroit metro area, there are a significant number of black males." *Id.* at 9. Accordingly, Babb claims that each of these facts is too generic to support the stop of any one particular vehicle.

Babb is correct that facts like common license plates or the race of the driver are characteristics too vague to support a stop because there are too many persons who fit the description. *See Florida v. J.L.,*

529 U.S. 266, 271, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000); *Northrop v. Trippett*, 265 F.3d 372, 382–83 (6th Cir.2001). However, we must view the description as a whole to determine whether it describes a sufficiently narrow class of vehicles. "Even if each specific fact relied upon by the authorities to make a *Terry* stop would not be a basis for suspicion when considered in isolation, the reasonable suspicion necessary to support an investigatory stop can still be found when it is 'based upon an assessment of all circumstances surrounding the actions of a suspected wrongdoer....'" *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir.1993) (quoting *United States v. Knox*, 839 F.2d 285, 290 (6th Cir.1988)); *see also United States v. Smith*, 263 F.3d 571, 588 (6th Cir.2001) (stating that "we must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately") (citations omitted). Totally innocent facts taken together significantly narrow the suspect group. Here, a black male of a certain age and size, driving a silver or grey Oldsmobile Alero with blue and white Michigan plates creates a sufficiently narrow class of suspects.

Babb also raises the case of *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam). In *Reid*, Drug Enforcement Administration ("DEA") agents stopped two men outside the airport in Atlanta, Georgia that they suspected of carrying drugs. As reasonable suspicion for the stop, the DEA agents relied on four factors: 1) the men had arrived from Fort Lauderdale, Florida, a known haven of drug activity; 2) the men arrived early in the morning, when police activity is less; 3) the two men appeared to be trying to conceal the fact they were traveling together by walking separately; and 4) they apparently had no luggage other than shoulder bags. *Id.* at 441, 100 S.Ct. 2752. The Supreme Court found that "the agent could not as a matter of law, have reasonably suspected [the defendant] of criminal activity on the basis of these observed circumstances," because "[t]he ... circumstances describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." *Id.*

Significantly, in *Reid* there was no underlying criminal event. Therefore, *Reid* is distinguishable. Here, the officers knew that a bank robbery had taken place, and that a man who matched the description in the BOLO was wanted in connection with that robbery. In other words, McGowan and Reinacher possessed knowledge of "specific and articulable facts," whereas the DEA agents in *Reid* did not.

■ Babb also claims that, even if the officers had reasonable suspicion for the stop, they did not have reason to remove him from his car, and to search the vehicle. However, police officers may order an occupant from a car, for their own safety, if they reasonably believe the occupants to be armed and dangerous. *See Garza*, 10 F.3d at 1246 ("In a situation where the officers have reason to believe the occupants of a vehicle are armed and dangerous, 'officers certainly may ... order occupants out of a car.'") (quoting *United States v. Hardnett*, 804 F.2d 353, 358 (6th Cir.1986)) (omission in original). Here, officers stopped Babb's vehicle on the basis of a BOLO. The BOLO stated that the suspect should be considered armed and dangerous, and that he had used an automatic pistol in the bank robberies. McGowan approached the vehicle and noticed black clothing in the backseat, and Babb gave evasive answers to the questions asked of him. These factors added to the suspicion around Babb. Accordingly,

McGowan had reasonable suspicion to believe that Babb was the armed and dangerous bank robber referenced in the BOLO. Therefore, safety concerns allowed McGowan to order Babb from the car, and there is no violation of the Fourth Amendment. *See Hardnett*, 804 F.2d at 357 (stating that the allowable scope of police activity during a *Terry* stop is governed by whether "the surrounding circumstances give rise to a justifiable fear for personal safety").

■ Babb also claims that the subsequent search of his vehicle's passenger compartment was in violation of the Fourth Amendment. The Supreme Court has stated to the contrary:

> [D]anger may arise from the possible presence of weapons in the area surrounding a suspect. These principles compel our conclusion that the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

*Michigan v. Long*, 463 U.S. 1032, 1049, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (citing *Terry*, 392 U.S. at 21, 88 S.Ct. 1868). Therefore, because McGowan had reason to believe Babb was armed and dangerous, his search of the Alero's passenger compartment for weapons was not in violation of Babb's Fourth Amendment rights.[3]

## III.

Lastly, Babb claims that there was insufficient evidence to support his conviction on all six counts. To support a conviction of bank robbery under 18 U.S.C. § 2113, the Government must prove: 1) that by intimidation, force, or threat of force; 2) Babb attempted to take an item of value; 3) in the custody or possession of a bank; 4) insured by the Federal Deposit Insurance Corporation ("FDIC"). *See United States v. Waldon*, 206 F.3d 597, 605 (6th Cir.2000).

First, Babb claims that each of the bank robbery counts must fail because the Government did not prove that each of the banks was federally insured. Second, he claims that the Government had not presented any evidence to tie Babb to the first two robberies, but only the third.

We review a claim of insufficient evidence drawing all inferences in favor of the Government to determine whether any rational trier of fact could have found the evidence sufficient to establish the elements of the alleged crime. If we find that a rational trier of fact could have found the evidence sufficient, then the defendant's claim of insufficiency fails. *See United States v. Daniel*, 329 F.3d 480, 485 (6th Cir.2003). A defendant challenging the sufficiency of the evidence on appeal carries a "very heavy burden." *See id.* (citations omitted).

■ Government witness Jodi Hickman, a financial sales representative at the Michigan National Bank in Grand Rapids, testified that the bank was insured by the FDIC. Government witness Patricia

---

**3.** Moreover, the fact that McGowan found what he believed to be cocaine, and no weapons, is of no consequence. "If, while conducting a legitimate *Terry* search of the interior of the automobile, the officer should, as here, discover contraband other than weapons, he clearly cannot be required to ignore the contraband, and the Fourth Amendment does not require its suppression in such circumstances." *Long*, 463 U.S. at 1050, 103 S.Ct. 3469. The presence of cocaine constituted probable cause for Babb's arrest, even if probable cause did not exist to arrest him for the bank robberies.

Hoogewind, an employee of the Michigan National Bank in Wyoming, testified that the deposits at her branch were likewise insured by the FDIC. Hoogewind testified that the FDIC insured each individual account up to $100,000, and that one could tell that Michigan National Bank was a federally insured bank because of the word "national" in its title. Lastly, Government witness Geraldine Kurdelski, a vice president at United Bank, testified that her bank was also FDIC insured, and that there were signs throughout the branch so indicating.

Citing *United States v. Harris*, 165 F.3d 1062 (6th Cir.1999). Babb contends that this Court has required the presentation of a bank certificate to satisfy the federal status element. However, in *Harris*, although we found the federal status element satisfied by the testimony of a bank employee and the presentation of a bank certificate, *id.* at 1066, we did not hold that the presentation of a certificate is the *only* means by which the element could be proved. Furthermore, in *United States v. Wood*, 780 F.2d 555 (6th Cir.1986), we actually held the element satisfied by the testimony of a bank security officer, without the presentation of an FDIC certificate. In *Wood*, we found that "[a]lthough we [were] troubled by the failure of the government to have introduced stronger proof of the FDIC-insured status of the bank ...," the testimony of a bank employee was sufficient evidence "to permit a rational trier of fact to find FDIC-insured status established beyond a reasonable doubt." *Id.* at 557. Moreover, here, as in *Wood*, Babb's counsel never challenged any of the witnesses on the banks' federal status. Therefore, a reasonable juror could well have concluded that the element was proved.

Babb's contention that the evidence was insufficient to prove that he participated in the first two bank robberies also lacks merit. The testimony of each of the bank employees, as well as the videotapes taken from each bank's surveillance camera, establishes that each of the robberies was performed by a black man wearing a black jacket with a white oval insignia, and hidden behind a clear mask with painted-on lips and eyebrows. Each time, the robber ordered the employees to empty the vault into a white garbage bag. This evidence was presented to the jury. We find that a rational jury could find that the similar circumstances of each robbery establish that the same man committed all three crimes. Babb admitted that he robbed the Michigan National Bank in Grand Rapids, and a clear mask that matches the one that eyewitnesses say was worn during the first two robberies was found in the trunk of his car. Therefore, we cannot say that the evidence was insufficient as a matter of law.

Moreover, at Babb's residence, police recovered bundles of currency in "Michigan National Bank" wrappers, as well as bundles strapped in wrappers marked with the initials, "KK." Keri Kopanen, a teller at the United Bank in Grand Rapids, testified that she was working the day that that bank was robbed, and that the robber forced her to empty her teller drawer and her "bus" and to give him that money. She further testified that she personally marked the bundles of currency in her drawer with her initials, "KK," and that the "KK" on the straps found in Babb's home was indeed her marking. Furthermore, police found an Avis rental car receipt for a green Chevrolet Cavalier. The car was rented in Detroit on March 8, 2000 and returned the next day, March 9, after having been driven 404 miles. Kopanen had testified that after the March 9 robbery of the United Bank in Grand Rapids, she saw a "teal green" car drive away. Detroit and Grand Rapids are 149 miles apart, so one can travel there and back

and travel less than 404 miles. In light of this evidence, we again cannot say that the evidence was insufficient to tie Babb to the first and second robberies.

## IV.

For the foregoing reasons, we **AFFIRM** the decision of the district court and uphold Babb's conviction.